UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **VEERAMATHU RAJARAVIVARMA,** | : | |
| **PLAINTIFF,** | : | |
| | : | **CIVIL ACTION NO.:** |
| | : | **3:09 CV1550 (VLB)** |
| | : | |
| **v.** | : | |
| | : | **MARCH 26, 2012** |
| **BOARD OF TRUSTEES FOR THE** | : | |
| **CONNECTICUT STATE UNIVERSITY** | : | |
| **SYSTEM, STATE OF CONNECTICUT** | : | |
| **AND JACK MILLER** | : | |
| **DEFENDANTS.** | : | |

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. #42]

Before the Court is a motion for summary judgment filed by the Defendants, the Board of Trustees ("Board") of the Connecticut State University System at Central Connecticut State University ("CCSU"), the State of Connecticut (the "State") and CCSU President Jack Miller ( "President Miller" or "Miller"), in his individual capacity. The Plaintiff, Veeramathu Rajaravivarma ("Rajaravivarma"), brought this suit alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII") by Defendants CCSU and the State for unlawful denial of tenure on the basis of religion, race and national origin discrimination and retaliation.  The Plaintiff also alleges violations of 42 U.S.C. § 1981, brought under 42 U.S.C. § 1983, by Defendant Miller for unlawful denial of tenure on the basis of national origin and race discrimination as well as a claim for deprivation of his constitutional right of intimate association.  Lastly, the Plaintiff alleges violations of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.* for the same conduct.  For the reasons stated hereafter, Defendants' motion for summary judgment is granted.

1

Facts

The following facts relevant to Defendant's motion for summary judgment are undisputed unless otherwise noted.  Rajaravivarma was hired as a full professor in the Computer Electronics and Graphics Technology Department at CCSU and began working at CCSU in the fall of 2001.  [Dkt. #42, Def.'s Statement of Undisputed Facts ("SUF"), ¶ 8].

Before beginning his career at CCSU, Rajaravivarma served as a research associate for four years and an engineering associate, in India, for three years.  [Dkt. #48, Pl.'s Statement of Disputed Facts ("SDF"), ¶5].  His first teaching position was as an assistant professor at Tennessee State University.  [*Id.* at ¶4].  He then taught at Morehead State University in Kentucky for three years as an assistant professor and one year as an associate professor.  [*Id.* at ¶3].  His most recent position before CCSU was teaching at the School of Technology at North Carolina A&T State University for seven years, six as an associate professor, and one year as full professor. [*Id.* at ¶1].  He received tenure at that position after four years of employment. [*Id.*].  He also ran his own research project at the School of Technology and managed several grants.  [*Id.* at ¶2].

The Computer Electronics and Graphics Technology Department at CCSU is one of five belonging to the School of Engineering and Technology.  [Dkt. #42, SUF, ¶ 10].  During the hiring process, he was interviewed by a faculty search committee which included Dr. Zanella, chair of the Department Evaluation Committee ("DEC") and Dr. Tracey, Department Chair, and also interviewed individually by Dean Kremens ("the Dean").  [*Id.* at ¶ 4].  Both the DEC and the Dean enthusiastically recommended him to be hired.  [*Id.* at ¶ 5-6].  Rajaravivarma identifies his national origin as Indian, his race

2

as Indian or Asian and his religion as Hindu.  [Dkt. #48, Pl.'s Statement of Disputed Facts ("SDF"), ¶¶ 23-24, 26].

The Collective Bargaining Agreement ("CBA") between the Board and the Connecticut State University American Association of University Professors requires that faculty members be reviewed and approved for renewal each year.  After six years, the faculty member is required to apply for tenure although he or she may elect to apply earlier.  If tenure is not granted, the faculty member's contract is renewed for an additional year and then the faculty member is discharged.  [*See generally* Dkt. #42, Ex. E, Attachment 1, CBA].  The review and evaluation process for tenure and renewal are the same as outlined in the CBA.  *See* [Dkt. #42, SUF, ¶ 19-58 and Dkt. #48, SDF, Plaintiff's Responses to Defendant's Rule 56(a)1 Statement, ¶ 19-58].

A faculty member applying for tenure or renewal submits a portfolio to the DEC for his or her department.  [Dkt. #42, SUF, ¶ 22].  The DEC reviews the materials and submits a recommendation to the Dean of the School that the Department belongs to. [*Id.*].  The DEC recommendation must be signed by all its members, but a DEC member may elect to include a minority report, if he or she disagrees with the majority recommendation, to also be forwarded to the Dean.  [*Id.* at ¶ 46].  The Department Chair is an "ex-officio, non-voting member of the DEC" who may submit a separate recommendation to either the DEC or directly to the Dean.  [*Id.* at ¶ 47-48].  If the candidate is applying for tenure, the Dean reviews all the materials and then submits his or her recommendation to the Promotion and Tenure Committee ("PTC").  [*Id.* at ¶ 49].  The PTC reviews all the materials and then submits a recommendation to the President.  [*Id.* at ¶ 51].  The President consults with the Provost (the Academic Vice President) and then sends his recommendation to the Board.  [*Id.* at ¶ 52-53].  The

3

President is provided with all the original materials in the portfolio submitted by the faculty member, as well as the recommendations made by the DEC, Dean, and PTC. The President is not bound by the recommendations of any other reviewers.  [*Id.* at ¶ 55-56].

The criteria for evaluating renewal and tenure applicants are also identical. Applicants are evaluated based on the quality of the candidate's activity, including keeping current in one's field, in five categories.  [*Id.* at ¶ 32].  These categories are weighed in the following order: 1) load credit activity, 2) creative activity, 3) productive service, 4) professional activity and 5) years in rank.  [*Id.*].

"Load credit activity" is described in the CBA as "teaching, coaching, counseling, department chairperson, division director, library service, research, student supervision, or any other function specified in the letter of appointment or subsequent extension of modifications of such appointment (see Article 4.7) or identified in a letter of agreement."  [*Id.* at ¶ 33].  Teaching is usually the single largest component of a candidate's load credit activity.  [*Id.* at ¶ 34].  Student evaluation forms are used as a significant method of assessing teaching quality, and virtually all candidates include all their student evaluations in the portfolio. [*Id.* at ¶¶ 35, 38].  While student evaluation forms vary from department to department, the Computer Electronics and Graphics Technology Department gives students a thirty one question survey for each course.  [*Id.* at ¶ 37].  For thirteen questions, the students are given a statement and asked to pick one of five possible responses: strongly agree, agree, disagree, strongly disagree or "the statement does not apply or I am uncertain."[1] [*Id.*].

---

[1]  The thirteen statements are: 1) Time spent in class was worthwhile, 2) Methods helped me understand the subject matter, 3) Major points made clear, 4) Instructor has been available to me individually, 5) I could make comments, ask questions, 6)

"Creative activity" is described in the CBA as "[c]reative activity appropriate to one's field, such as delivering papers at professional conferences, production / performance of artistic works, research, study and publication." [*Id.* at ¶ 39]. Accordingly, the indicators of quality of creative activities are diverse and vary by field. [*Id.* at ¶ 40].

"Productive service" is described in the CBA as "[p]roductive service to the department and university."  Productive service may include, but is not limited to, serving on the Faculty Senate, chairing a departmental search committee, serving on a curriculum committee or organizing student recruitment efforts."  [*Id.* at ¶ 42].

"Professional activity" is described in the CBA as "[p]rofessional activity, such as attendance and participation in conferences and workshops, membership and service in appropriate professional organizations and other professional activities." [*Id.* at ¶ 43].

"Years in rank" refers to the number of years held at a certain teaching rank and the parties do not dispute the Plaintiff's years in rank.

Although it appears that Rajaravivarma was required to apply for renewal each year, the parties have not submitted facts with respect to each year Rajaravivarma was renewed and have only provided certain facts with respect to Rajaravivarma's renewal for 2003, 2005, and 2006.  In mid-April, 2003, the DEC, which was comprised by Dr. Zanella, Olusegun Odesina and Sanford Rich, reviewed Rajaravivarma's performance for renewal for the following academic year.  [Dkt. #42, Ex. D, Attachment 1].  The

---

Class meetings are intellectually stimulating, 7) Readings helped me understand the subject, 8) Exams helped me understand the subject, 9) Work has been graded fairly, 10) Number of exams, etc. is sufficient, 11) Class makes me want to learn more, 12) Quality of instruction is "high", 13) Overall course quality is "high."  [Dkt. #48, Ex. E, Professional Activites at CCSU].

evaluation generally commended his performance.  [*See id.*]  However, the DEC did address three points of concern.  First, under teaching load (the main component of load credit activity), the DEC noted that "[i]n general the evaluations for the Fall 2002 show improvement from Spring 2002.  Students in CET 501 in both semesters did express some concerns about the course, which we hope Dr. Rajaravivarma addresses the next time he teaches the course." [*Id.*]  Second, under creative activity, the DEC "would encourage Dr. Rajaravivarma to continue the grant writing which he was actively involved with prior to coming to CCSU." [*Id.*].  Lastly under "Service," the DEC noted that Dr. Rajaravivarma had taken over developing a Computer Engineering Technology degree program built from their existing Electronic Technology and Networking programs butthey "would ask Dr. Rajaravivarma to communicate better with his colleagues in the networking program.  We would encourage him to coordinate with the other faculty working in that area to establish a state-of-the-art facility." [*Id.*].  Rajaravivarma was ultimately renewed in 2003 to continue his employment with CCSU.

Shortly after the DEC voted to recommend Rajaravivarma for renewal, Dr. Tracey, the Department Chair, sent an e-mail on May 2, 2003 to Dean Kremins, expressing some concerns she had with Rajaravivarma (who went by the nickname of Ravi at CCSU).  She wrote that she "would like to schedule a meeting with you, Ravi and myself as we had intended to do several months ago.  There are many issues we have discussed between us the past year, one being the gender and cultural issues, students have also brought these to my attention." [*Id.*].  Dr. Tracey also indicated that "Rajiv and I had a confrontation yesterday after I sent the email stating that I was finalizing the selection of a computer table and Cisco lab upgrade.  He said 'that he demanded my respect because he was a Full Professor.'  I feel there are many social,

cultural and gender issues clouding the departmental environment and working relationships." [*Id.*]. In addition, Dr. Tracey indicated Deborah and her met with Ravi to discuss networking purchases and that "[b]efore we looked at the list of equipment, I asked Ravi what his vision was for the Networking program because we needed to purchase equipment to meet that vision. He could not answer the question, he became defensive, irritated, disruptive and to the process. This is his normal reaction to both Deborah and me." [*Id.*].

In summer of 2004, Rajaravivarma traveled to India during July and August to perform a Hindu ritual in his ancestral village because it was the first anniversary of his father's death. Rajaravivarma asserts that he informed his departmental colleagues that he would be away to participate in a Hindu ceremony. [Dkt. #48, SDF, ¶ 40]. Rajaravivarma alleges that during the first week of the Fall 2004 semester while he was teaching he heard Dr. Zanella yelling and shouting repeatedly "Where is he." [*Id.* at ¶41]. Rajaravivarma alleges that Dr. Zanella then entered his classroom and said "I was looking for you all over," "where were you this summer." [*Id.*]. Rajaravivarma further alleges he tried to talk to Dr. Zanella after class about what was bothering her and that Dr. Zanella was agitated and said she would "take care of [him]." [*Id.*].

Rajaravivarma then alleges that later that same day at a department meeting, he raised the issue of Dr. Zanella's interruption of his class and told his colleagues that he didn't understand why Dr. Zanella was so upset because he had informed her and his other colleagues that he was traveling to India to participate in a Hindu ritual. [*Id.* at ¶42]. Rajaravivarma alleges that in response Dr. Zanella grew angry and said "I don't care what your religious beliefs are, I don't care about them. I care about the lab. . . . The lab was messy. I don't care what you were doing, you son-of-a-bitch." [*Id.* at ¶ 43].

Rajaravivarma then objected to the insult to his mother to which Dr. Zanella replied, "What's wrong with that?  This is America.  People call people son-of-a-bitch.  It's common."  [*Id.*]

Rajaravivarma had responsibility within his department for the development of a new undergraduate degree in computer engineering technology.  In order to obtain certification for the degree from the Department of Higher Education, Rajaravivarma wrote and circulated a report on potential job opportunities for degree candidates in that field.  [*Id.* at ¶ 44].  In response to the report, Rajaravivarma alleges that Dr. Tracey told him that his conclusions were "wrong" and "You guys from India are taking away all of these jobs."  [*Id.*].

In the spring of 2005, Rajaravivarma was part of a faculty search committee to hire a new junior faculty position for the department.  At one meeting, the committee was reviewing the group of qualified applicants to select individuals for telephone interviews.  [*Id.* at ¶ 46].  At this meeting, Rajaravivarma alleges that Dr. Tracey said, "I wish this were a John Smith," which Rajaravivarma interpreted to be referring to the fact that all the qualified applicants were Indian, Middle Eastern or Southeast Asian rather than Caucasian and not US citizens.  [*Id.*].

In mid-April 2005, the DEC reviewed Rajaravivarma's performance and recommended him for renewal.  Their evaluation generally was positive.  [Dkt. #42, Ex. D, Attachment 2].  However, the evaluation noted that "[t]he student evaluations for the graduate level courses are generally more positive than from the undergraduate courses.  Although many students indicate that Dr. Rajaravivarma has done a good job in the classroom, many other students have not been happy with the lack of laboratory or hands-on work or with the online curriculum or course text book.  We hope that Dr.

Varma has addressed these constructive comments to improve his classroom experience." [*Id.*]

On April 26, 2005, Dean Kremens also recommended Rajaravivarma for renewal with similar reasoning to the DEC. [Dkt. #42, Ex. B, Attachment 1]. He stated while "[h]is student evaluations of classroom performance are generally positive. I need to reiterate however, with the DEC, that the practical aspects of the courses, i.e. lab experiments need some revising and revisions by the instructor. I agree that more adequate technical experiments be included into the lab based courses. I would recommend that the course syllabuses be more extensive and contain full schedule with timetable of lectures and laboratories topics, following the school's format." [*Id.*]. He also recommended that Rajaravivarma should "launch a long-term research agenda, appropriate for a computer engineering discipline and present outcomes at professional engineering forums," although he did recognize that Rajaravivarma had made positive overall progress in terms of creative activity. [*Id.*].

In mid-April, 2006, the DEC reviewed Rajaravivarma's performance and recommended him for renewal for another year, but had several concerns with his performance. [Dkt. #42, Ex. D, Attachment 3]. Under creative activity, the DEC's evaluation noted that Rajaravivarma "has not published any refereed journal articles since 1994." [*Id.*]. Under load credit activity, the evaluation noted that "Dr. Rajaravivarma receives some praise in his student evaluations, specifically in regards to him being a nice person in his treatment of students. However, there are sufficient comments critical of his lack of hands-on knowledge and real-world applications to be of concern." [*Id.*]. The evaluation also contained a category captioned as "Recommendations." In that section, the DEC noted that it "encourages Dr.

Rajaravivarma to submit publications to a referred journal soon.  In addition, there is real concern about the lack of leadership exhibited by him as a full professor.  It was the school's intention when hiring Dr. Rajaravivarma that he would be a leader in his department especially in regards to the networking and Computer Engineering Technology (CET) program."  [*Id.*].  With regards to a new degree program, the DEC noted that Dr. Rajaravivarma "put together the proposal for the CET program that was eventually approved by the Department of Higher Education" but that "[u]nfortunately, Dr. Rajaravivarma has done little to recruit students to this program as he was directed to do by the department.  He also has not taken any initiative in working with other departments to develop needed courses for the program." [*Id.*].  Lastly, the DEC indicated that the "students continued comments regarding Dr. Rajaravivarma [sic] lack of knowledge in networking are disturbing.  Dr. Rajaravivarma presented himself as qualified to work with networks (CCNA certified) when he was hire.  However, he does not have previous work experience in the field.  This lack of experience is showing up in class.  The DEC highly recommends that Dr. Rajaravivarma get some hands-on experience in the field, perhaps as volunteering to shadow an expert."  [*Id.*].

On April 19, 2006, Dr. Tracey, as Chair of the Department, wrote a recommendation against renewal to the Dean.  [Dkt. #42, Ex. C, Attachment 2].  For load credit activity, she stated that "[t]he comments from the student evaluations are both good and bad.  The students find Dr. Rajaravivarma 'a nice guy' but lacking the technological expertise in networking. (See student comments).  This is a concern since Dr. Rajaravivarma was hired for his technical expertise in networking."  [*Id.*].  Dr. Tracey also indicated that "[h]is leadership and guidance in the laboratory has been

lacking."  [*Id.*].  For creative activity, she stated that "Dr. Rajaravivarma has several grants sited in his renewal documentation, many of which were obtained prior to his arrival at CCSU."  Dr. Tracey also indicated that "[i]t is a concern that he has not published any of his conference papers in referred journals.  As a full professor it is an expectation to publish in a broader scope in his Engineering.  His last citation of a refereed journal article was 1994."  [*Id.*].  For productive service, she stated that "Productive Service to the University and Department can be considered average."  She also noted that Rajaravivarma "misrepresented the number of advisee [sic] to be 108, when in fact new advising list are [sic] disseminated each semester and the active advisees are 48 undergraduate students for the Spring/Fall 2006 semester.  Student advising seems to be lacking because several of Dr. Rajaravivarma's advisees continue to ask for my assistance or advice."  [*Id.*].

Dr. Tracey further indicated that Rajaravivarma "has not taken responsibility for working out the specifications of a second level course to be offered by Computer Science.  It wasn't until the course was recently proposed by the Computer Science department that Dr. Rajaravivarma responded to an email dialog regarding course name, language to be taught etc.  I asked him specifically to work out all details for this class even to write the course proposal and submit it to the Computer Science department for review, he failed to do this and now all details must be worked out during the University Curriculum review process."  [*Id.*].  She also criticized his lack of initiative in recruiting for the new degree provided and lack of curriculum contribution to the department.  [*Id.*].  Lastly, Dr. Tracey stated that "Dr. Rajaravivarma was hired to lead the department in the networking technology field, he has not provided any forward look, initiated any curriculum development or revision."  [*Id.*].

On May 6, 2006, the Dean recommended Rajaravivarma to President Miller for renewal "with serious reservations." [Dkt. #42, Ex. B, Attachment 2].  He wrote that "[t]he student evaluations are both positive and negative.  The negative evaluations include student comments that Dr. Rajaravivarma is lacking in practical application of the subject matter.  In technology programs, unlike some theoretical engineering curricula, the practical skills and proficiency of the instructor in laboratory environment are critical to student success in the educational process.  This weakness is still visible in Dr. Rajaravivarma's performance in this category."  [*Id.*].  The Dean did commend Rajaravivarma for improving the format of his course syllabi since his last renewal recommendation.  [*Id.*].  The Dean also reiterated his prior recommendation to launch a long term research agenda and noted that Rajaravivarma has applied unsuccessfully for several external grants.  [*Id.*] He expressed leadership concerns, finding that Rajaravivarma had "failed to provide the expected leadership in the lab development and equipment modifications."  [*Id.*].  In other productive service aspects however, he found Rajaravivarma's contributions to the department and university to be "adequate."  [*Id.*].  The Dean concluded by saying that he fully agrees with the criticisms and recommendations of the DEC's 2006 report.  [*Id.*] He also indicated that he shares the DEC's concerns that Rajaravivarma lacks "the hands-on teaching skills and necessary leadership which are obviously expected from a full professor.  Thus he requires additional mentoring and counseling."  [*Id.*].  However, the Dean indicated that in his opinion, Dr. Rajaravivarma had "minimally [met] the quality standards" for renewal.  [*Id.*].

In May, 2006, Rajaravivarma's wife Rathika Rajaravivarma was denied tenure at CCSU.  [Dkt. #48, SDF, ¶ 30].  In October, 2006, his wife filed an administrative

complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and with the Equal Employment Opportunity Commission ("EEOC") claiming discrimination on the basis of race, national origin and sex. [*Id.* at ¶ 31]. She and three other females were denied tenure in the spring of 2006.

In the spring of 2006, President Miller held an open faculty forum to discuss the denial of tenure to female candidates which Rajaravivarma attended. [*Id.* at ¶ 35]. At this forum, Miller explained the criteria he uses to evaluate candidates for tenure. [*Id.* at ¶¶ 57-58]. Plaintiff alleges that President Miller stated at this forum that for "load credit activity, or teaching, a successful candidate for tenure, in his judgment, needed to show up for class, teach the classes in an intellectually honest manner with reasonably high standards and have responses on the student evaluations within the normal range." [*Id.*]. Plaintiff also alleges that President Miller stated that "with respect to creative activity or scholarship, he thought a successful candidate for tenure needed to perform an adequate job of demonstrating traditional scholarship by a few paper presentations at important conferences, a few publications and work on grant activity." [*Id.*].

Plaintiff alleges that in the fall of 2006, CCSU's Faculty Senate Diversity Committee initiated an investigation into the denial of tenure to female candidates and issued a critical report on promotion and tenure opportunities at CCSU for women faculty. [*Id.* at ¶ 36]. Following the issuance of the report, the denial of tenure to Rajaravivarma's wife was discussed in a number of Faculty Senate meetings which were attended by Rajaravivarma and President Miller. At these meetings, Plaintiff alleges that he spoke out against the discriminatory treatment of his wife. [*Id.* at ¶¶ 36-37].

In the fall of 2006, Rajaravivarma submitted an application for tenure after serving six years at CCSU.  [*Id.* at ¶ 63].  His application consisted of a portfolio which he compiled and included student evaluations for every course he taught at CCSU, teaching materials, published papers, documents of professional activities, documents of service to the university and community and letters of recommendation.  [*Id.* at ¶ 64].

The DEC reviewed the materials Rajaravivarma had submitted for consideration and recommended Rajaravivarma for tenure on November 15, 2006.  [*Id.* at ¶ 67].  The DEC recommendation stated that most of Rajaravivarma's load credit activity comes from teaching, having taught many courses, working as a coordinator for laboratory courses, helping revise the curriculum for three existing classes and helping develop a new Bachelor of Science program.  [Dkt. 48, Ex. A, Attachment 7].  The DEC recommendation indicated that Rajaravivarma's "philosophy regarding teaching is evident in his ability to influence students as seem by his student's evaluation of his teaching.  He has been consistently rated positively by the majority of the class with a proportional range of 76% to 100% of the class population for all the major questions on the faculty evaluation survey of the courses he has taught except for CET 249 (spring 2005), where he received a proportional positive rating of 72% of the class population.  A look at the comments by the majority of the students indicates a positively overwhelming review with suggestions to improve in a few cases." [*Id.*].  The DEC further noted that Rajaravivarma has recently passed the Cisco Certified Internetwork Expert examination which they indicate is a prestigious exam in the Computer Networking Technology field.  [*Id.*].  With regards to creative activity, the DEC commended Rajaravivarma for publishing fifteen articles and presenting twenty

14

two papers since his time at CCSU.  [*Id.*].  The DEC also noted that Rajaravivarm has applied for forty research proposals for grants over his academic career and that at CCSU, he applied for fifteen grants and obtained eight of them.  [*Id.*].  For productive service, the DEC noted that Rajaravivarma was on eight university wide committees, a student advisor to both graduate and undergraduate students, a program and lab coordinator and an active participant in both university wide and School of Engineering and Technology activities.  [*Id.*].  He also volunteers in the external community at Hartford Hospital, the Connecticut Invention organization, Noah Wallace School council and the New England Trio day program.  [*Id.*].  For professional activities, the DEC noted the numerous professional organizations that Rajaravivarma belongs to as well as the many conferences, workshops and conventions he has participated in and attended.  [*Id.*].

Dr. Zanella, chair of the DEC, wrote an extensive minority report on November 15, 2006, indicating that she did not recommend Rajaravivarma for tenure.  In her minority report, Dr. Zanella indicated that she believed, in her professional opinion, tenure should not be granted because Rajaravivarma had not met the quality of activity for load credit activity, creative activity and productive service.  [Dkt. #48, Ex. A, Attachment 8].  For load credit activity, she indicated that Rajaravivarma "has received load credits as lab coordinator for the networking laboratory; however he did not take an aggressive approach to designing and setting up the networking lab.  In the end, other faculty teaching in the lab demanded something be done with the lab.  Shortly after that the School of Engineering and Technology computer staff took over the direction of the lab.  The department chair had handled much of the equipment determination and ordering."  [*Id.*].  Dr. Zanella also noted that his student evaluations

ranged from "very positive to very negative.  When the data is sorted by undergraduate versus graduate level, the graduate rankings of Dr. Rajaravivarma's classroom performance is consistently significantly higher than undergraduates.  The undergraduate student rankings put Dr. Rajaravivarma's performance in the C+ to B range with the quality of classroom instruction ranted [sic] below 80 for the previous two academic years."  After observing his teaching in class, she called his lecturing "uninspiring and the majority of class time seems to be spent in lab with the students working independently."  [*Id.*].

    For creative activity, Dr. Zanella commented that "[a]lthough Dr. Rajaravivarma should be commended for attending and presenting at so many conferences, the caliber of publication is below what is expected of a full professor."  She explained that Rajaravivarma had put his name on five publications that were written by graduate students, although he had supervised them.  [*Id.*].  Additionally, four papers were presented that were ultimately not published.  [*Id.*].  In terms of grants, Dr. Zanella indicated all five of Rajaravivarma's proposals to the National Science Foundation were rejected.  [*Id.*].  He received four grants from the union to which he belongs and the School of Technology.  [*Id.*].  He also assisted two student pairs in receiving student-faculty grants from the School of Technology and two more student pairs in receiving CCSU Faculty-Student grants.  [*Id.*].  For productive service, she commented that his service to the university and community were acceptable, but noted that despite being asked by the department chair he did not write the re-licensing document for the Department of Higher Education and that although he did collect information from other faculty members the "majority of the progress report was written by the chairperson."  [*Id.*].  Dr. Zanella also commented that although he helped develop the

new degree program, none of the actual courses were ever taught by him and the faculty teaching them were the ones who developed the curriculum. [*Id.*]. For professional activities, she recognized the large number of professional organizations and work he has done. [*Id.*]. Lastly, Dr. Zanella clarified that while Rajaravivarma has passed the written examination for the Cisco Certified Internetwork Expert certification, "however he is not certified at this level until he passes the hands on portion of the exam." [*Id.*].

On November 14, 2006, Dr. Tracey, the Department Chair, submitted to Dean Kremins a recommendation to deny Rajaravivarma tenure. [Dkt. #48, Ex. A, Attachment 9]. Dr. Tracey stated that "[i]n my professional opinion, he has not met the quality of activity in the following categories … credit activity, creative activity and productive service." [*Id.*]. For load credit activity, she reiterated her previous comment from her prior recommendation on renewal that the "comments from the student evaluations are both good and bad. The students find Dr. Rajaravivarma 'a nice guy' but lacking the technological expertise in networking technology (see student comments). This is a great concern for the department and program development since Dr. Rajaravivarma was hired for his technical expertise in networking. Dr. Rajaravivarma has donated time at Hartford Hospital to enhance his skill base, but that does not seem to be enough practice knowledge to support the classes he is currently teaching." [*Id.*]. Dr. Tracely also found that "his leadership and guidance in the networking laboratory has been lacking." [*Id.*]. For creative activity, she noted with concern that he has not published in a peer referred journal since 1994, stating that "[a]s a full professor it is an expectation to publish in a broader scope in his field of Engineering." [*Id.*]. She also indicated that many of his cited grants were obtained before his time at CCSU and

several of his publications are in regional and national conference proceedings.  [*Id.*].
For productive service, she concluded that he "can be considered average."  She
found that his academic advising "seems to be lacking, because several of Dr.
Rajaravivarma's advisees continue to come to my office to seek advice in course
selections and planning for graduation."  [*Id.*; *see also* Dkt. #42, Ex. C, Attachment 1 (e-
mails from students to Dr. Tracey)].  She also indicated that when Rajaravivarama was
asked to initiate a recruitment plan for a degree program, "[h]e seemed to hesitate
sending anything unless there was a brochure.  I instructed him to write the letter . . .
to get a dialog started.  He did acquire a mailing list for the Project Lead the Way
teaching, but there was never any follow through in the form of an informational letter."
[Dkt. #48, Ex. A, Attachment 9].  She also criticized his handling of the proposal to the
Department of Higher Education, stating that although his portfolio suggests that he
authored this document, in reality, he "gathered resumes of the faculty and did some
basic assembly.  The completion of the progress report was written by me."  [*Id.*].

Rajaravivarma submitted rebuttal letters to both Dr. Zanella's minority report and
Dr. Tracey's negative evaluation.  *See* [ Dkt. #48, Ex. A, Attachment 12-13].

On December 15, 2006, Dean Kremins reviewed all the materials available,
including Rajaravivarma's rebuttals as well as the original portfolio, and submitted a
recommendation against tenure.  [Dkt. #48, Ex. A, Attachment 14].  In the
recommendation, the Dean stated that "[p]reviously, I indicated some weaknesses in
my renewal letter with regard to [load credit activity] activity.  This year, repeated
negative comments indicate a pattern of deficiency in the practical aspect of the
subject matter as well as some pedagogy concerns.  Specifically, comments in Spring
2006 CET 249 and CET 449 evaluations (which are attached in the portfolio) raise the

same concerns.  I do not believe, overall, that the attached student evaluation statistics provide clear evidence of any progress compared with previous years." [*Id.*].  He commented that "in applied engineering and technology programs, the contribution of the laboratory component is paramount to students' ultimate success.  Consequently, in my opinion, the overall evaluation of 'load credit activity' is that Dr. Rajaravivarma failed to meet the standard of quality." [*Id.*].  For creative activity, the Dean noted that Rajaravivarma has published papers in various conferences.  [*Id.*].  For grants, he indicated that Rajaravivarma had made "major efforts" but all his applications were unsuccessful.  [*Id.*].  These factors lead the Dean to conclude that Rajaravivarma only met the "minimum standard of quality." [*Id.*].  For productive service, he recognized that Rajaravivarma was a member of many department and university committees, but found that Rajaravivarma "has not provided expected program/lab leadership and initiative thus his service to the department has been lacking." [*Id.*].  For professional activities, he recognized the various professional organizations and functions in that Rajaravivarma participates.  [*Id.*].

On March 1, 2007, the PTC submitted a unanimous recommendation to President Miller supporting a grant of tenure.  [Dkt. #48, Ex A, Attachment 16].  The PTC memorandum contains no reasons for their decisions, only the vote tally for each candidate but did mention that upon request, reasoning would be given.  [*Id.*].  The parties have not submitted any evidence that a request was made or that reasoning was provided by the PCT.

On April 13, 2007, President Miller reviewed the application and issued a decision to deny tenure.  In a letter dated April 13, 2007, Miller wrote Rajaravivarma to inform him that he was denied tenure.  President Miller did not provide his reasons for

19

denying tenure in this letter. [Dkt. #48, Ex. A, Attachment 18]. It appears that Rajaravivarma then requested an explanation from President Miller pursuant to the terms of the CBA from CCSU's Greivance & Contract Administration Committee. Shortly thereafter on April 30, 2007, President Miller issued a letter addressed to Rajaravivarma explaining his reasons for denying tenure. [*Id.*]. The April 30 letter stated that President Miller has "carefully reviewed the tenure recommendations of the Computer/Graphics Technology Department Evaluation Committee, the Dean of the School of Technology, and the Promotion and Tenure Committee. In addition, I have reviewed all submitted materials and recommendations and consulted with Dr. Carl Lovitt, Provost/Vice President for Academic Affairs. I have also reviewed a statement by the Department Chair." [*Id.*]. President Miller stated that "[a]fter my review of the materials you submitted, the documentation of the quality of activity is not sufficient to warrant the award of tenure." He further explained that [i]n reviewing the materials you presented in the areas of load credit activity (4.11.9.1) and creative activity appropriate to one's field (4.11.9.1), I have determined that your materials did not sufficiently demonstrate the standard of quality noted above and do not justify the selective award of tenure." [*Id.*]. Lastly, President Miller indicated that his while his "assessment does not coincide with that of the overall vote of the DEC nor with the Promotion and Tenure Committee, it does coincide with the assessments of the DEC Chair, the Department Chair, the Dean, and the Provost." [*Id.*].

President Miller has no contractual obligations to review tenure applications in a certain manner. [*See* Dkt. #42, Ex. E, Attachment 1, CBA]. In his deposition, he described how he generally reviews tenure applications. He explained that he "read[s] and review[s] the information and make[s] a professional judgment on the quality of

that work."  He testified that "I read the actual substantive information before I look at any of the other recommendations.  So I take out the – I look at the student evaluations. I read some in some cases, all in other cases, of the articles and publications submitted, where they were submitted to.  I look at the quality of the sources in which they appeared.  I look at their service assignments and what work they did, both professional to the community and to the university service." [Dkt. #48, Ex. H, Deposition of Miller, 17:7 – 18:17].  "On professional development" he testified that since that "tends to be pretty uniform" he at least "will glance over that." [*Id.* at 18:17-18:19].  He further testified that "in the order starting with load credit in teaching and moving to the top – the top two big ones, load credit in teaching, and creative activity, I do a review.  And in some cases I will say to myself, this is obviously upstanding work. In other cases I will say to myself, this is not so good.  And then on the cases where I have some question, I will go back and maybe read some things again.  And that's where I start in detail with the reviews from the other levels." [*Id.* at 18:19-19:3].

President Miller stated in his deposition that after "I've made some initial assessment.  I haven't finished the recommendation, but I've made some initial assessment.  And then I go through – it doesn't have to be done this way, this is just the way I do it.  And then I go through and I look at the evaluations … probably two-thirds of the ones that come in are very strong.  So those I go and look, and almost inevitably – there are occasions, there have been occasions where I haven't concurred with the assessment, but most often those concur." [*Id.* at 19:3-19:16].  President Miller further testified that where his initial assessment  does not concur with the other evaluations submitted and where the evaluations are "not  so excellent, then I go in and I begin to look in some detail of what other people have assessed, and

occasionally they will be – there will be things in their assessment – not just a decision which may be counter to mine or their recommendation might be counter to my recommendation, but there may also be specific pieces of information in there where I say, oh yeah, okay.  I need to go back and re-look at that.  So those evaluations help me in the continued examination before I develop my recommendation, as does the conversation with the provost."  [*Id.* at 19:17-20:12].

President Miller also indicated that with respect to assessing student evaluations that "there are quantitative, the numerical evaluations.  And yes, those tend to run high, but you look and see.  Some departments will provide actual normative – I know I've called them before anchor points.  They'll say: In these courses the average student evaluation – because different courses sometimes have different evaluations.  Maybe a graduate course tends to get, in certain departments, a higher evaluation than an introductory undergraduate, or in the opposite in some departments I support."  [*Id.* at 31:1-31:11].  Miller then testified that he would "go and look at the qualitative side, the student written comments and the kinds of things they say.  In some cases it's pretty obvious that they aren't many, and you can't make too much of a judgment about that…And in some, those are telling and in some they are not … but you look at those comments."  [*Id.* at 31:11-32:12].   Lastly, President Miller testified that "there's the faculty member comments if they've done some observations in the classroom.  There are – if the department chair – department chairs are the ones who end up seeing the students, getting direct feedback from the students because the students come in and say you, 'this course is a mess' or 'this is the best course I ever had' or those kinds of things.  So department chairs tend to be probably one of the best sources for student input or a good source.  Maybe not the best, but a good

source of student input." [*Id.* at 32:13-32:24].

President Miller was also asked in his deposition "what it was about [Rajaravivarma's] load credit activities that caused you to believe that it didn't meet the quality standards that you felt was necessary to be awarded tenure." [*Id.* at 72:6-72:9]. In response he answered that "I think his load credit activity, his teaching was – in my assessment of all of the information, was weak. Wasn't the worst I've ever seen, but it wasn't good… I don't know what a good term would be. Mediocre. There were some positives, there were some negatives. He was generally viewed as a pretty nice guy, but not – in some classes he was viewed as doing a good job, in other classes they were uneven. The student comments weren't terribly supportive. There weren't many of them and there weren't a lot of things about 'this is an excellent class.' There wasn't a lot of support there." [*Id.* at 72:13-72:24].

President Miller was also asked in his deposition if he "relied heavily on the characterizations of [Rajaravivarma's] activities by the dean and Professor Zanella and Professor Tracey?" to which he responded "they were certainly a part of what I considered." [*Id.* at 72:19-73:3]. President Miller was further questioned "so where the dean or Dr. Tracey or Dr. Zanella focused in terms of load credit activity, was that something that, as you're reading both the portfolio and the comments, focused your attention on what might be problems in that area?" [*Id.* at 75:14-75:19]. President Miller responded

> No. I read all of these first. Before I looked at any of those … I looked at the student evaluations. I looked at the vita and the papers presented. I read a few of the copies of publications. I glanced through, read some abstracts, other things like that. Then I went and – and so I started in with some kind of notion. And while I can't recall exactly this process whatever it was, four, five years ago… I always do the same way. So I would have gone through, I would have read them. I'm quite certain I would have said after looking at these and looking at the [student] evaluations, this isn't real good. Now let's go see – and other

people obviously had different points of view.   The DEC had a different point of view than the other three that are here.  But it wasn't them that focused me on that.  I would have focused myself on that and then I would have gone and looked at what other people said about it.
[*Id.* at 75:20-76:14].

President Miller further explained that "[a]t some point in the review I reviewed all of this information.  I will not say that I read every single individual sheet word for word, but when I go in and look in a review, in a summary and see some of the kinds of [student] evaluation that occurred where there were points of concern, or when I read later on a letter from the Dean that says 'we have real problems with this class.  We addressed this with him; it doesn't seem to be improving; that kind of thing, I would go to that set and review every one of those.  But I'm not saying that I linearly [reviewed]." [*Id.* at 77:6-77:17].

Once again Miller testified in his deposition that he would "probably not" have reviewed the DEC recommendation and the dean's as a part of his initial review "[b]ecause I do the first reading, as I said, absent those.  So even if part of them were there, I don't think I would look at the – I think that's after I've read them all."  [*Id.* at 101:2-101:9].  President Miller was further asked in his deposition whether the inputs of the DEC majority report, the DEC minority report, the chair of the department's report and the dean's reports were important in his decision-making process.  President Miller responded that "[a]ll the information was important.  All of the information he submitted was important; all of the information that was – so was the DEC's report which was positive.  The positive part of the DEC's report, I guess would be the right way to put it.  And the P&T vote.  They were all important."  [*Id.* at 103:16-104:3].

<u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*, (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

   "A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted).

<u>Analysis of Preliminary and Threshold Issues</u>

   The complaint consists of a recitation of facts followed by cursory assertions of claims into which all the facts are incorporated by reference where or not each fact incorporated tends to establish an element of the claim.  Consequently, the Defendant filed for summary judgment on bases which, while fairly inferred as being germane, are in fact not.  The Court will first clarify the record by disposing of these issues.  First,

Defendants have moved for summary judgment on the basis that the Court lacks subject matter jurisdiction over Plaintiff's Title VII claims against President Miller because President Miller is not an "employer" subject to Title VII liability.  In Plaintiff's opposition to summary judgment, Plaintiff clarifies that he did not intend President Miller to be a Defendant in his Title VII claim and indicated that if necessary he would amend his complaint to eliminate any ambiguity.  The Court therefore construes the complaint to allege a Title VII claim solely against CCSU, the Board and the State.

Second, Defendants have argued they are entitled to summary judgment on Plaintiff's CFEPA claim because the Eleventh Amendment bars a claim against the State in federal court since the State has not consented to suit in federal court.  In his opposition to summary judgment, Plaintiff indicated his consent to the entry of summary judgment on his CFEPA claims.  The Court therefore grants summary judgment as to Plaintiff's CFEPA claims.

Third, Defendants argue that they are entitled to summary judgment on Plaintiff's Title VII claims for failure to exhaust his administrative remedies by obtaining a right to sue letter.  Plaintiff obtained a Right to Sue Notice dated October 28, 2009 which was after he commenced the instant lawsuit on September 29, 2009.  The Supreme Court has held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  The Second Circuit has explained that "[e]very circuit before us that has faced the question has held that a plaintiff's failure to obtain a notice-of-right-to-sue-letter is not a jurisdictional bar, but only a precondition to bringing a Title VII action that can be waived by the parties or the court.  *Pietras v.*

*Bd. of Fire Com'rs of Farmingville Fire Dist.*, 180 F.3d 468, 474 (2d Cir. 1999) (citing *Rivers v. Barberton Bd. of Educ.*, 143 F.3d 1029, 1031 (6th Cir.1998); *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 505 (1st. Cir.1996); *Gooding v. Warner–Lambert Co.*, 744 F.2d 354, 358 (3d Cir.1984)).  Courts in this circuit have found that a "plaintiff who commences a Title VII action before receiving a right-to-sue letter may nonetheless maintain the action upon subsequent receipt of the letter." *Civil Serv. Employees Ass'n, Inc., Local 1000, AFSCME, AFL-CIO v. New York State Dept. of Parks*, Recreation & Historic Pres., 689 F. Supp. 2d 267, 276 (N.D.N.Y. 2010) (finding that "while this practice is discouraged," the plaintiff subsequently obtained a right-to-sue letter which "cured the defect caused by its failure to receive notice of its right to sue prior to filing this action"); *Blanke v. Rochester Telephone Corp.*, 36 F. Supp. 2d 589, 592 n.1 (W.D.N.Y. 1999) (holding that although "[i]t [wa]s not clear why plaintiff apparently filed the complaint in this action prior to his receipt of the right-to-sue notice.  Since issuance of a right-to-sue notice is not a jurisdictional requirement, however, the EEOC's subsequent issuance of the notice satisfies the statutory requirements in this case.").

Plaintiff indicated the he obtained a release of jurisdiction from the CHRO on September 22, 2009.  [Dkt. #48, Ex. B].  On the same date, the Plaintiff also obtained a letter from the EEOC office in Boston, MA that confirmed it was forwarding his request for a right-to-sue letter from the Department of Justice ("DOJ").  [*Id.*].  The right-to-sue letter from the DOJ was dated October 28, 2009, which is after the commencement of this lawsuit.  Here, Plaintiff had confirmation that the DOJ was being notified of his request for a right-to-sue letter before the filing of the lawsuit.  Though the Plaintiff did not receive the letter before filing the instant complaint, the defect was cured upon

27

receipt of the letter, which was only about a week after the Defendants were served in the instant action and a month after the complaint was filed.  Although the Defendants raised this issue as an affirmative defense in their answer, Defendants did not submit a motion to dismiss on this basis.  Voluminous discovery has been undertaken and a substantive motion for summary judgment has been filed and before the Court.  In light of these circumstances and the fact that the right to sue letter was subsequently obtained soon after the complaint was filed, the Court finds it appropriate to deem that this "precondition to bringing a Title VII action" has been waived.

Fourth, Defendants argue they are entitled to judgment on Plaintiff's Title VII racial discrimination claim because Plaintiff's CHRO/ EEOC complaint failed to alleged discrimination based on race and instead only alleged discrimination based on religion, national origin, and ancestry.  The Second Circuit has long held that "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency.  A claim is reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Deravin, III v. Kerik*, 335 F.3d 195, 200-201 (2d Cir. 2003) (internal quotation marks and citations omitted).  The Second Circuit has further recognized that "race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case."  *Deravin*, 335 F.3d 195, 201-202 (2d Cir. 2003) (holding that "even in the absence of an express linkage between race and national origin, the specific facts alleged by a plaintiff in his or her EEOC complaint may suggest both forms of discrimination.").  Here, Plaintiff's claim for discrimination based on race is reasonably related to his claim for discrimination

based on national origin and would have undeniably fallen within the scope of the EEOC / CHRO's investigation.  Therefore, Plaintiff's claim for discrimination based on race may be pursued in this subsequent federal court action.

Fifth, Defendants argue they are entitled to judgment on Plaintiff's Title VII retaliation claim to the extent that it is based on the alleged retaliation for his own protected activity of speaking out at the faculty senate meeting regarding the discriminatory treatment of his wife.  Defendants argue that Plaintiff's CHRO/EEOC complaint only alleged retaliation for his wife's protected activity of filing a CHRO complaint and not for his own speech at the faculty senate meeting.  Plaintiff argues that the cover sheet for his CHRO Affidavit of Discriminatory Practice, which he filed *pro se*, indicated that he believed he was retaliated against because he previously opposed discriminatory conduct and that he spoke about his own protected speech during the CHRO's fact finding conferences.   However the Court need not address whether the Plaintiff adequately alleged retaliation for his own protected activity in his CHRO/EEOC complaint because Plaintiff's claim for his own protected activity is reasonably related to his claim for his wife's protected activity and therefore may be pursued in this subsequent federal action.

<u>Analysis of Title VII Discrimination Claim</u>

Title VII makes it unlawful for an employer to "fail or refuse to hire ... or otherwise to discriminate against any individual ... because of such individual's race, color, [or] ... national origin." 42 U.S.C. 2000e-2(a)(1).  Plaintiff's denial of tenure claim is analyzed under the three-step burden shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

"Under this familiar framework, the plaintiff must first establish a prima facie

case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified to be a tenured professor; (3) he suffered an adverse employment action in the denial of tenure; and (4) the circumstances give rise to an inference of discrimination.   The defendant must then articulate a legitimate, non-discriminatory reason for the denial of tenure.   Once the defendant has articulated such a reason, the presumption of discrimination disappears, and the question in reviewing a motion for summary judgment becomes whether the evidence, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that the denial of tenure was motivated, at least in part, by discrimination." *Tori v. Marist Coll.*, 344 Fed.Appx.697, 2009 WL 2767006, at *1 (2d Cir. 2009).   "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action … To get to the jury, it is not enough ... to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination."   *Weinstock v. Columbia University*, 224 F.3d 33, 43 (2d Cir. 2000) (internal quotation marks and alterations omitted).

The Second Circuit has emphasized that "Title VII does not require that the candidate whom a court considers most qualified for a particular reason be awarded that position; it requires only that the decision…not be discriminatory." *Wharff v. State University of New York*, 413 Fed. Appx. 406, 408 (2d Cir. 2011). The "Second Circuit has noted repeatedly that tenure decisions involve unique factors which set them apart from ordinary employment decisions, and federal courts should exercise caution in reviewing them." *Grant v. Cornell Univ.*, 87 F.Supp.2d 153, 157 (N.D.N.Y. 2000) (citing

*Fisher v. Vassar College*, 70 F.3d 1420, 1434-35 (2d Cir. 1995); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92 (2d Cir. 1984); *Lieberman v. Gant*, 630 F.2d 60, 64 (2d Cir. 1980)).  Such caution is warranted by the Second Circuit's concern that courts "'should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure.  Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.'"  *Bickerstaff v. Vassar College*, 196 F.3d 435, 456 n.7 (2d Cir. 1999) (quoting *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir. 1980)).

   The Second Circuit has further emphasized that:

> When a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination can be drawn. Indeed, to infer discrimination from a comparison among candidates is to risk a serious infringement of first amendment values. A university's prerogative to determine for itself on academic grounds who may teach is an important part of our long tradition of academic freedom. Although academic freedom does not include the freedom to discriminate, this important freedom cannot be disregarded in determining the proper role of courts called upon to try allegations of discrimination by universities in teaching appointments. The Congress that brought educational institutions within the purview of Title VII could not have contemplated that the courts would sit as Super-Tenure Review Committee[s].

*Lieberman*, 630 F.2d 60 at 67 (internal quotation marks and citation omitted, alteration in original); *see also Zahorik*, 729 F.2d at 92 (noting that "the number of factors considered in tenure decisions is quite extensive.  The particular needs of the department for specialties, the number of tenure positions available, and the desired mix of well known scholars and up-and-coming faculty all must be taken into account.

The individual's capacities are obviously critical. His or her teaching skills, intelligence, imagination, willingness to work, goals as a scholar and scholarly writing must be evaluated by departmental peers and outsiders asked to render advice. The evaluation does not take place in a vacuum, however, but often in the context of generations of scholarly work in the same area and always against a background of current scholarship and current reputation of others.").

Lastly for a plaintiff challenging his denial of tenure under Title VII, he "must show more than a denial of tenure in the context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university" and "[a]bsent evidence that such disagreements are motivated by invidious considerations such as gender, universities are free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties or reviewing authorities." *Zahorik*, 729 F.2d at 94 (internal quotation marks and citations omitted). However, the Court is mindful that "[t]enure decisions are not exempt under Title VII," *Zahorik*, 729 F.2d at 93, and that it must "steer a careful course between excessive intervention in the affairs of the university and the unwarranted tolerance of unlawful behavior." *Powell v. Syracuse University*, 580 F.2d 1150, 1154 (2d Cir. 1978)

Here, it is undisputed that Plaintiff is a member of a protected class and that he suffered an adverse employment action when he was denied tenure. In addition, the Plaintiff has presented sufficient evidence of his academic experience and credentials as well as the fact that he met the minimum qualifications to be considered for tenure by CCSU to meet his *de minimis* burden to establish that he was qualified for the

position of tenured professor.

The parties dispute whether Plaintiff has demonstrated an inference of discrimination and whether Plaintiff has demonstrated that Defendant's proffered non-discriminatory reasons for denying Plaintiff tenure were a pretext for unlawful discrimination.  Defendant has proffered that it denied tenure because of deficiencies in the Plaintiff's load credit activity, most notably in his teaching, and his creative activity, with particular regard to his lack of peer reviewed articles.  Plaintiff primarily relies on the "cat's paw" theory of liability to demonstrate that the circumstances surrounding his denial of tenure give rise to an inference of discrimination and to rebut Defendants' proffered non-discriminatory reasons for denying tenure.

A. Cat's Paw Theory of Liability

The cat's paw theory[2] of liability has been the subject of a recent Supreme Court decision which involved employment discrimination under the Uniformed Services and Reemployment Rights Act ("USERRA").  *Staub v. Proctor Hosp.*, ----U.S.----, 131 S.Ct. 1186 (2011).  In *Staub*, the Supreme Court considered "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision."  131 S. Ct. at 1189.  In a "cat's paw" case, a plaintiff typically seeks to hold his employer liable for the animus of a supervisor who was not charged

_____

2  The Supreme Court has explained that the "term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by [Judge] Posner in 1990."  *Staub*, 131 SCt. at 1190 n. 1.  In the fable, "a monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat had done so, burning its paws in the process, the monkey leaves the cat with nothing."  *Id.*  The Supreme Court explained that "[a] coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward."  *Id.*

with making the ultimate employment decision.  The Supreme Court held that a plaintiff may establish "cat's paw" liability under USERRA "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  131 S.Ct. at 1198. The Supreme Court explained that "[p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'"  *Id.* at 1192 (quoting *Hemi Group LLC v. City of New York*, 559 U.S. 1, 130 S.Ct. 983, 989, 175 L.Ed.2d 943 (2010)).

The Supreme Court declined to "adopt a hard-and-fast rule" in cat's paw cases which would immunize an employer who performs an independent investigation and exercises judgment independent on the other hand from the allegedly biased supervisor.  *Staub*, 131 S.Ct. at 1193.  The Supreme Court explained that "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action" then the employer will not be liable.  *Id.*  However, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."  *Id.*   The Supreme Court further explained that its holding, contrary to the dissent's characterization, reflected the longstanding principle that an employer should only be liable when it had delegated part of the decision making power to the biased supervisor.  *Id.*  The Supreme Court reasoned that "if the independent investigation relies on facts provided by the biased supervisor – as is necessary in any case of cat's-paw liability – then the

employer (either directly or through the ultimate decision maker) will have effectively delegated the fact finding portion of the investigation to the biased supervisor." *Id.*

Although the Supreme Court's decision involved USERRA, the Court sees no reason why *Staub*'s holding should be limited to the USERRA context.  First, the Supreme Court expressly indicated in *Staubs* that USERRA was similar to Title VII.  *Id.* at 1191.  Second, the Supreme Court's analysis was predicated upon underlying principles of agency and tort law which are equally applicable to all types of employment discrimination.  See *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (finding that Congress intended courts "to look to agency principles for guidance" when determining employer liability under Title VII).  Lastly, courts in this Circuit have concluded that the Supreme Court's holding in *Staub* should be extended to Title VII claims. *See e.g., Abdelhadi v. City of New York*, No. 08-CV-380, 2011 WL 3422832, at *4 n.5 (E.D.N.Y. Aug. 4, 2011) (noting that "there is no meaningful difference between" USERRA and Title VII); *Saviano v. Town of Westport*, No.3:04-CV-522RNC, 2011 WL 4561184, at *7 n.15 (D. Conn. Sept. 30, 2011) (noting that Supreme Court in *Staub* suggested its holding also applied to Title VII claims).

In addition, although it does not appear that the Second Circuit has formally recognized the applicability of "cat's paw" to Title VII the Second Circuit and districts courts within the Circuit have recognized theories of subordinate bias in employment discrimination cases.   See *Saviano*, 2011 WL 4561184, at *7 n.15 (noting that while the Second Circuit has not formally recognized the "cat's paw" theory, it has "held that bias at any stage of a decision process can taint the ultimate decision in violation of Title VII").  The Second Circuit in *Bickerstaff v. Cassar Coll.*, 196 F.3d 435 (2d Cir. 1999) "recognize[d] that the impermissible bias of a single individual at any stage of the

promoting process may taint the ultimate employment decision in violation of Title VII. This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the promotion process."  196 F.3d at 450.

Accordingly, the theory of liability that the "impermissible bias of a single individual can infect the entire group of collective decision makers…at least when the decision makers are overly deferential to the biased individuals' recommendations" is one that is well accepted by courts within this Circuit.  *Baron v. N.Y. City Dep't of Educ.*, No.06-CV-2816 (FB)(MDG), 2009 WL 1938975, at *6, 8  (E.D.N.Y. 2009) (finding in an ADEA action that since the evaluations made by allegedly biased subordinate made up only a portion of the plaintiff's file that negated "any inference that the committee that made the termination decision was tainted by [the subordinate's] alleged bias") ; *see also*, *Fullard v. City of New York*, 274 F.Supp.2d 347, (S.D.N.Y. 2003) ("[T]he employer will be liable where the decision-maker 'rubber stamps' the recommendation of [biased] subordinates; in such cases, we say that the decision-maker acts as a conduit of the subordinates' improper motive." (citations, internal quotation marks and citations omitted); *Britt v. Merrill Lynch & Co., Inc.,* No.08CV5356, 2011WL 4000992, at *8 (Aug. 26, 2011) (considering whether Plaintiff had alleged facts establishing a cat's paw theory of liability); *Fullard v. City of N.Y.*, 274 F.Supp.2d 347, 357 (S.D.N.Y. 2003) ("the bias of the subordinate will support a finding of liability as long as it played a substantial role in the final decision").  The Court will therefore examine whether Plaintiff has demonstrated an inference of discrimination and demonstrated that Defendant's non-discriminatory reasons were a pretext for unlawful discrimination on the basis of cat's paw liability under the standard articulated in *Staub*.

The Plaintiff argues that two of his supervisors Dr. Zanella and Dr. Tracey were biased against him and that their negative tenure recommendations were the proximate cause of President Miller's decision to deny Plaintiff tenure.   Under *Staub,* Plaintiff must first demonstrate that Dr. Zanella and Dr. Tracey performed an act motivated by racial, national origin, or religious bias; second, that Dr. Zanella and Dr. Tracey intended to cause Plaintiff to suffer an adverse employment action; and third that Dr. Zanella and Dr. Tracey's acts were the proximate cause of President Miller's decision to deny Plaintiff tenure.

i.     *Analysis of whether Dr. Zanella performed an act motivated by animus and intended to cause an adverse employment action*

The Plaintiff argues that Dr. Zanella's negative tenure recommendation was an act motivated by racial, national origin, or religious animus and intended to cause an adverse employment action.  Plaintiff asserts that Dr. Zanella's bias is demonstrated by her alleged discriminatory comments made during her confrontation with Rajaravivarma regarding the condition of his lab in the summer of 2004.  Plaintiff alleges that Dr. Zanella was upset about the messy condition of his lab and that when he explained to her that his lab was messy because of his trip to India for a Hindu ceremony she retorted "I don't care what your religious beliefs are, I don't care about them.  I care about the lab. . . . The lab was messy.  I don't care what you were doing, you son-of-a-bitch."  [Dkt. #48, SDF, ¶43].  Plaintiff further alleges that when he objected to the insult to his mother, Dr. Zanella replied, "What's wrong with that?  This is America.  People call people son-of-a-bitch.  It's common."  [*Id.*].

However, without more, no reasonable juror could conclude that Dr. Zanella's comments within the context of their interaction demonstrated that she harbored any discriminatory animus towards the Plaintiff.  Dr. Zanella's statements were certainly

made out of frustration and anger towards the Plaintiff regarding the condition of his lab, but they do not demonstrate more than her anger over the state of his lab and the dereliction of his responsibility to oversee and manage his lab even when he was away for whatever reason.  A reasonable juror could not conclude that Dr. Zanella's mere mention of religion in her comments to Rajaravivarma is sufficient to demonstrate her animus towards his religion, race or national origin.   Considering the context of the interaction, it is clear that Dr. Zanella was only responding to Rajaravivarma's explanation that his lab was messy because he was traveling to India to participate in a Hindu ceremony and not a reflection of her inherent bias against his religion, race or national origin.  Therefore Dr. Zanella only referenced Rajaravivarma's "religious beliefs" because Rajaravivarma referenced the religious reason for his trip.  [*Id.* at ¶ 40].  "Religious beliefs" could have easily been replaced by another phrase if Rajaravivarma was away for another reason.   For example, if he had simply said he was away on vacation, it would not be surprising if Dr. Zanella had responded that she did not care about his vacation, and only cared about the lab.

In addition, no reasonable juror could conclude that Dr. Zanella's use of the profane phrase and her explanation in response to Rajaravivarma's objection to the insult that in American people use the profane idiom and that "it's common" evinced a discriminatory animus.  [*Id.* at  ¶ 42-43].   While Dr. Zanella's comments were unprofessional, she used the phrase to merely express her frustration and anger over Rajaravivarma's irresponsibility towards his lab.   A reasonable juror could not conclude that the use of the phrase expressed her attitude towards his religion, race or national origin.  Further her statement that "[t]his is America" and "it's a common" phrase is really only explanation in response to Rajaravivarma's objection to the insult.

Since Rajaravivarma indicated that he did not understand the idiomatic meaning of the profane phrase Dr. Zanella merely explained to him, albeit in an imprudent manner, that culturally the term is not an insult aimed at anyone's mother but a generalized insult. Taking Dr. Zanella's comments in context, no reasonable juror could conclude that her comments were motivated by any discriminatory animus.  It is apparent that the focus of her remarks was not Rajaravivarma's religious beliefs, which she indicated she does not care about, but rather on the messy condition of the lab which she believes was his fault.

"Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Silver v. N. Shore Univ. Hops.*, 490 F.Supp.2d 354, 362 (S.D.N.Y. 2007).  "Often, however, an employer will argue that a purportedly discriminatory comment is a mere 'stray remark' that does not constitute evidence of discrimination." *Id.*  "Although courts have often used the term 'stray remark' to refer to comments that do not evince a discriminatory motive, the Second Circuit has found that the term 'stray remark' 'represented an attempt-perhaps by oversimplified generalization-to explain that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.'" *Galimore v. City University of New York Bronx Community College*, 641 F.Supp.2d 269, 284 (S.D.N.Y. 2009) (quoting *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)).

"Accordingly, the task is not to categorize remarks 'either as stray or not stray,' and 'disregard [remarks] if they fall into the stray category,' but rather to assess the remarks' 'tendency to show that the decision-maker was motivated by assumptions or

attitudes relating to the protected class.'"  *Id.* (citation omitted).  Courts have found the following factors relevant to such a determination: "(1) who made the remark, *i.e.,* a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.,* whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.,* whether it was related to the decisionmaking process."  *Silver*, 490 F.Supp.2d at 363 (citations omitted).

Plaintiff argues that a remark "cannot be labeled 'stray' where they are made by individuals involved in some manner with the adverse employment action against the Plaintiff coupled with the Supreme Court's jurisprudence on 'cat's paw' liability and proximate cause in *Staub*."  [Dkt. #47, Pl. Mem., 28].  Plaintiff appears to be suggesting that under the framework of "cat's paw liability" the allegedly biased supervisor is in effect the decision maker.  A central principle behind "cat's paw liability" is the delegation of decision making power to the biased supervisor.  The Court therefore agrees that within a "cat's paw" case the allegedly biased supervisor should be considered a decision-maker for purposes of a "stray remark" analysis.

Although one of the factors that courts consider is whether the remark was made by a decision-maker or supervisor, contrary to Plaintiff's contention, the Second Circuit has acknowledged that "[s]tray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."  *Danzer v. Norden Sys. Inc.*, 151 F.3d 50, 56 (2d Cir. 1998); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("while it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, we have held that when other indicia of discrimination are properly presented, the remarks

40

can no longer be deemed stray, and the jury has a right to conclude that they bear a more ominous significance.") (internal quotation marks and citation omitted); *see also Campbell v. Alliance Nat'l Inc.*, 107 F.Supp.2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.") (internal quotation marks and citation omitted).

In addition, it is highly unlikely that the Supreme Court's decision in *Staub* somehow rendered the "stray remark" jurisprudence less germane as Plaintiff suggests.  As the Second Circuit explained the court's task is to assess the remarks "tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi*, 478 F.3d at 115.  The Court sees no reasons why it cannot and should not assess whether the purported remarks of a "cat's paw" supervisor have the tendency to show that the supervisor was motivated by bias. Since one of the necessary elements to establish cat's paw liability is a finding that the supervisor was biased, it would seem not only appropriate but prudent to assess whether Plaintiff's evidence of verbal comments do have the tendency to show that the supervisor was motivated by bias.  The Court therefore sees no obstacle in applying a "stray remark" analysis to determine whether a "cat's paw" supervisor is in fact biased.  Without sufficient evidence demonstrating that the supervisor was biased and that the supervisor performed an act motivated by such bias there can be no cat's paw liability.  Therefore, the "stray remark" inquiry is equally germane in a "cat's paw" case. If anything the Supreme Court's decision in *Staub* suggests that the "stray remark" inquiry should be altered in one minor respect to focus on the nexus between the allegedly discriminatory remarks and the act that the supervisor as opposed to the

41

ultimate decision maker performed which allegedly proximately caused the ultimate employment action.

Here as explained above, Dr. Zanella's comments do not have a tendency to show that she was motivated by assumptions or attitudes relating to Rajaravivarma's religion, race or national origin.  A reasonable juror could not view the content of her remarks as discriminatory.  It is further undeniable that the context in which the remarks were made was unrelated to her negative tenure recommendation.   At best, the content and context of her comments demonstrate that she was motivated by her frustration with Rajaravivarma for leaving his lab a mess while he was away for the summer.  In addition, Dr. Zanella's comments from the fall of 2004 were made two years before she recommended against granting tenure in the fall of 2006 and were therefore temporally remote from her negative tenure recommendation.  Moreover in both April 2005 and April 2006 after the allegedly discriminatory comments were made, Dr. Zanella as the chair of the DEC, recommended Rajaravivarma for renewal.  *See* [Dkt. #42, Ex. D, Attachments 2 and 3].   If Dr. Zanella was truly motivated by bias against Rajaravivarma's national origin, race or religion as Plaintiff contends, then she would have likely recommended against his renewal in 2005 and 2006.  The fact that Dr. Zanella voted to renew Rajaravivarma's employment with CCSU for two consecutive years after she made the allegedly discriminatory remarks suggests that there was no nexus between her remarks and her negative tenure recommendation.  This is further buttressed by the fact that Dr. Zanella also recommended that Rajaravivarma be hired as a full professor at CCSU.   See *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.) ("when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be

inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring.").   Here, Dr. Zanella voted in April 2006 to renew Rajaravivarma's employment and just over six months later issued her recommendation against tenure.   These factors strongly suggest that "invidious discrimination was unlikely." *Id.*

Considering the content and context of Dr. Zanella's remarks, a reasonable jury could not conclude that the remarks have a tendency to show that Dr. Zanella was motivated by assumptions or attitudes relating to Rajaravivarma's national origin, race or religion.   These remarks can be considered oblique and remote from Dr. Zanella's allegedly biased act of recommending against tenure and therefore "less they prove that the action was motivated by discrimination." *Tomassi*, 478 F.3d 111 at 115.   Here the only evidence of Dr. Zanella's alleged bias that Plaintiff has submitted are these allegedly discriminatory remarks.   As the Second Circuit has concluded "stray remarks [even] of a decision-maker, without more, cannot prove a claim of employment discrimination." *Abdu-Brisson, Inc.*, 239 F.3d at 468.   Plaintiff has failed to present "other indicia of discrimination" such that a reasonable juror could conclude that Dr. Zanella's remarks "bear a more ominous significance." *Id.*   Accordingly, a reasonable juror could not conclude based on the evidence in the record that Dr. Zanella performed an act motivated by bias against Rajaravivarma's national origin, race or religion.

   ii.   *Analysis of whether Dr. Tracey performed an act motivated by animus and intended to cause an adverse employment action*

The Plaintiff argues that Dr. Tracey's negative tenure recommendation was an act motivated by racial, national origin, or religious animus and intended to cause an

adverse employment action.  Plaintiff asserts that Dr. Tracey's bias is demonstrated by (i) her May 2003 email to the Dean expressing that there were gender and cultural issues between her and Rajaravivarma; (ii) her spring 2005 comments regarding job opportunities for the proposed new degree program in which she allegedly told Rajaravivarma that "you guys from India are taking away all of these jobs" and (iii) her comment that she wished there were a "John Smith" in the pool of qualified applicants for a junior faculty position.

Considering the content and context of Dr. Tracey's email to the Dean, a reasonable juror could not conclude that her email had the tendency to show that she was motivated by assumptions or attitudes towards Rajaravivarma's national origin, race or religion.  In the email, Dr. Tracey merely identifies what she feels is a source of workplace tension and is reaching out to the Dean in an effort to address and improve the workplace environment.  Further, Dr. Tracey is not just reaching out regarding her own personal interactions with Rajaravivarma but also bringing to the Dean's attention issues several students have raised to her and which, as Department Head, she is presumably obligated to address with the Dean.  A reasonable juror would not conclude that Dr. Tracey's recognition of and desire to ameliorate social, culture and gender issues support an inference that she was biased.  To conclude otherwise would risk holding the workplace hostage to an inflexible sense of political correctness and potentially eliminate valuable and needed dialogue on social, cultural or gender issues. Here, the remarks in her email were not made in relation to her negative tenure recommendation which occurred three years after the email was sent.

Moreover, her remarks in the email were not in any way related to any decision making process on her behalf.  In fact, Dr. Tracey's email can be read to suggest that

Rajaravivarma, himself, harbors bias against women and that she was reaching out to Dean Kremins because she felt that Rajaravivarma's bias against women was affecting his working relationships with herself, other female colleagues and his female students.  There is simply no nexus between her email expressing her desire to engage in a dialogue with the Dean and Rajaravivarma seeking his intervention to assist in resolving the social, cultural and gender issues and her act of recommending against granting tenure.

Plaintiff also argues that Dr. Tracey's animus is evidenced by her response to the job prospects report Rajaravivarma circulated in support of the creation of a new degree proposal.  Dr. Tracey stated that she disagreed with his conclusion that there were ample job opportunities for candidates who obtained the proposed degree and stated "You guys from India are taking away all of these jobs."  [Dkt. #48, SDF, ¶ 44].  A reasonable juror could arguably conclude that Dr. Tracey's comment was merely her explanation for disagreeing with Rajaravivarma's conclusions that students acquiring the degree would have job prospects in the United States because outsourcing had shifted those positions to India.  Arguably her comment could be construed as a reflection of her understanding and belief of outsourcing trends and the impact of those trends on the potential U.S. job market for graduates of CCSU and not a reflection of animus towards Rajaravivarma's national origin or race.  A reasonable juror is more likely to consider this comment alone benign and not evidence of race or national origin discrimination.

Lastly, Plaintiff argues that Dr. Tracey's animus is evidenced by her alleged comment that she wished there were a "John Smith" in the pool of qualified applicants for a junior faculty position where the pool was comprised of applicants from India, the

Middle East or Southeast Asia.  Considering that this alleged discriminatory comment was made in the context of a decision to hire a professor, albeit not within relation to her act of recommending against tenure, a reasonable juror could conclude that such remark has to the tendency to show that Dr. Tracey was biased against and thus discriminated against individuals from Indian, Middle Eastern or Southeast Asian descent.  The content of the remark is explicitly racial in nature and can be seen to reflect a bias in favor of hiring a Caucasian professor over an Indian professor.  Since the remark was made within the context of hiring professors, there is arguably a nexus between her remark and her act of recommending against tenure.

If a juror concluded that Dr. Tracey prefers to hire and promote Caucasian professors over professors of Indian, Middle Eastern or Southeast Asian descent that juror could also consider Dr. Tracey's outsourcing remark when viewed in conjunction with her remark about preferring a "John Smith," as further evidence of discriminatory animus.  When viewing the facts in the light most favorable to Plaintiff, a juror could conclude that these comments "bear a more ominous significance" and are reflective of impermissible bias.  *Abdu-Brisson*, 239 F.3d at 468.

Since Dr. Tracey recommended against granting Rajaravivarma tenure, a reasonable juror would also likely conclude that Dr. Tracey intended to cause Rajaravivarma an adverse employment action when she recommended that he not be promoted.  Lastly, since Plaintiff has presented evidence that one of his supervisors who issued a recommendation against granting tenure was motivated by impermissible bias he has likely demonstrated an inference of discrimination to meet his *de minimus* burden to establish his *prima facie* case of discrimination.  The Court will then consider whether Plaintiff has demonstrated that Defendants' non-

46

discriminatory reasons were a pretext for unlawful discrimination by establishing that the allegedly biased supervisor's acts were the proximate cause of President Miller's decision to deny Plaintiff tenure.

### iii. Analysis of whether Dr. Zanella and Dr. Tracey's acts were the proximate cause of President Miller's decision to deny tenure

Although the Court has found that Dr. Zanella did not exhibit discriminatory animus, the Court will, assuming arguendo, analyze whether either Dr. Zanella's or Dr. Tracey's negative tenure recommendations were the proximate cause of President Miller's decision to deny tenure.  Given the undisputed facts regarding President Miller's decision making process, a reasonable juror could not conclude that either Dr. Zanella's or Dr. Tracey's acts were the proximate cause of President Miller's decision to deny tenure.

The Plaintiff argues that President Miller relied on Dr. Zanella's and Dr. Tracey's negative recommendations because of their positions as Chair of the DEC and Department Chair respectively.  Plaintiff further argues that Dr. Zanella and Dr. Tracey's negative recommendations must have been the proximate cause of President Miller's decision because the DEC and the PTC voted to grant Rajaravivarma tenure and therefore, despite his un-refuted testimony to the contrary, President Miller must have relied upon Dr. Zanella and Dr. Tracey's negative recommendations to come to his conclusion that tenure should be denied.  The Plaintiff highlights that President Miller's principal reasons for denying tenure, that Rajaravivarma had deficiencies in load credit and creative activity, were the same as the reasons articulated by Dr. Zanella and Dr. Tracey in their negative recommendations as further support for proximate causation. This conclusion is refuted by the evidence which establishes that President Miller

concluded that Rajaravivarma should not be granted tenure before he reviewed the recommendations of Dr. Tracey or Dr. Zanella.

It is undisputed that President Miller read and reviewed Dr. Zanella and Dr. Tracey's negative recommendations as part of his decision making process.  However, without more, the fact that President Miller read their recommendations and also concluded that Rajaravivarma had deficiencies in load credit and creative activity is not sufficient to demonstrate that a direct relation exists between their negative recommendations and President Miller's ultimate decision.

The undisputed facts demonstrate that President Miller first read and reviewed the portfolio that Rajaravivarma compiled which included student evaluations for every course he taught at CCSU, teaching materials, published papers, documents of professional activities, documents of service to the university and community and letters of recommendation.  Throughout his deposition testimony, President Miller testified that he first reads the underlying materials and comes to his own independent assessment regarding whether to grant or deny tenure before reviewing any other recommendations from the tenure process.  Miller testified "I read the actual substantive information before I look at any of the other recommendations.  So I take out the – I look at the student evaluations.  I read some in some cases, all in other cases, of the articles and publications submitted, where they were submitted to.  I look at the quality of the sources in which they appeared.  I look at their service assignments and what work they did, both professional to the community and to the university service." [Dkt. #48, Ex. H, Deposition of Miller, 17:7 – 18:17].  He testified that in some cases he will have read through the portfolio material multiple times and only then will turn to review the recommendations provided by the other levels of the tenure

process.  [*Id.* at 18:19-19:3].  Therefore President Miller first independently assessed the quality of Rajaravivarma's load credit and creative activity by reading through the student evaluations himself and reviewing Rajaravivarma's publications and came to the conclusion on his own that Rajaravivarma was deficient in these categories. *See* [*Id.* at 75:20-76:14, 101:2-101:9].  President Miller characterized Rajaravivarma as "mediocre" based on his review of his submissions before he considered the opinions of others.  [*Id.* at 72:13-72:24].

    After this initial assessment, President Miller then reviewed the other recommendations from the other evaluations in the tenure process.  In this case, President Miller reviewed the DEC's positive recommendation, the PTC's positive vote, Dr. Zanella's minority report, Dr. Tracey's negative recommendation, and the Dean's negative recommendation.  Although President Miller read and considered the other recommendations, there is no evidence that he accepted the conclusions of the other recommendations.  In fact, after he reviewed them he independently assessed whether those conclusions were warranted by the underlying material in the portfolio.  Miller testified that he will "look in some detail of what other people have assessed… [and] there may also be specific pieces of information in there where I say, oh yeah, okay.  I need to go back and re-look at that.  So those evaluations help me in the continued examination before I develop my recommendation." [*Id.* at 19:17-20:12].  Therefore, President Miller did not just rely on the conclusions of the recommender and instead assessed whether there was underlying evidence in the portfolio which, in his opinion, validated that recommender's conclusions and assessment.  For example, President Miller testified that when he read the Dean's recommendation which indicated that there were real problems with a particular class that he went to "that set and review[ed]

49

every one of those" student evaluations.  [*Id.* at 77:6-77:17].  Since the President did

not blindly accept the conclusions or assessments from any recommendation but

engaged in an independent investigation to determine if he agreed with the

assessment based on the underlying material in the portfolio, the allegedly biased

recommendations from Dr. Tracey and Dr. Zenalla, validating President Miller's prior

independent assessment, were inconsequential.  While validating, they were too

remote, contingent or indirect to establish proximate causation.

In fact, President Miller was directly asked in his deposition if the Dean, Dr.

Tracey, and Dr. Zanella focused his attention of the issue of load credit activity to which

he unequivocally responded

> No.  I read all of these first.  Before I looked at any of those … I looked at the
> student evaluations.  I looked at the vita and the papers presented.  I read a few
> of the copies of publications.  I glanced through, read some abstracts, other
> things like that.  Then I went and – and so I started in with some kind of notion …
> I'm quite certain I would have said after looking at these and looking at the
> [student] evaluations, this isn't real good.  Now let's go see – and other people
> obviously had different points of view.   The DEC had a different point of view
> than the other three that are here.  But it wasn't them that focused me on that.  I
> would have focused myself on that and then I would have gone and looked at
> what other people said about it.

[*Id.* at 75:20-76:14].  The evidence is clear that President Miller first came to his own

conclusion and then after reading the recommendations against tenure evaluated the

validity of those recommendations by looking at the factual basis cited in support of

the recommendations.

The Plaintiff argues that President Miller's "cat's paw" reliance on Dr. Tracey is

evidenced by his testimony that generally a Department Chair's evaluation is a good

source of student feedback.   Miller testified that "department chairs are the ones who

end up seeing the students, getting direct feedback from the students because the

students come in and say you, 'this course is a mess' or 'this is the best course I ever

had' or those kinds of things.  So department chairs tend to be probably one of the best sources for student input or a good source.  Maybe not the best, but a good source of student input." [*Id.* at 32:13-32:24].  However, President Miller clarified that in his opinion the Department Chair is a good source but not the best source of student feedback.  Miller also unequivocally testified that with respect to his assessment of Rajaravivarma's load credit activity that Dr. Tracey, the Department Chair, did not focus him on this issue but instead he determined Rajaravivarma had deficiencies in load credit activity through his independent review of the student evaluations and prior to even reading Dr. Tracey's recommendation.

Further when President Miller was asked "what it was about [Rajaravivarma's] load credit activities that caused you to believe that it didn't meet the quality standards that you felt was necessary to be awarded tenure."  He did not reference Dr. Tracey, Dr. Zanella or anyone else's recommendations, nor did he parrot their rationale, he indicated that his belief was based on his own assessment of the student evaluations and he explained the factual basis for his independent conclusions.  For example, he answered "[t]here were some positives [student evaluations], there were some negatives … The student comments weren't terribly supportive.  There weren't many of them and there weren't a lot of things about 'this is an excellent class.'  There wasn't a lot of support there."  [*Id.* at 72:13-72:24].  As noted above, his deposition testimony evinced a firm command of Rajaravivarma's performance at CCSU.

A reasonable juror could not conclude that Dr. Tracey's or Dr. Zanella's recommendation were the proximate cause of President Miller's decision to deny tenure where there is overwhelming evidence that President Miller's conclusions were based on his own prior independent assessment of the underlying portfolio submmited

by Rajaravivarma.  Since President Miller engaged in an independent investigation and independently assessed the underlying student evaluations and Rajaravivarma's academic publications a reasonable juror could not conclude that Dr. Tracey or Dr. Zanella's recommendations proximately caused his decision.

Although in *Staub* the Supreme Court declined to "adopt a hard-and-fast rule" in cat's paw cases which would immunize an employer who performs an independent investigation and exercises judgment independent from the allegedly biased supervisor, the Supreme Court acknowledged that there are circumstances where an independent investigation will defeat a finding of "cat's paw" liability. *See Staub*, 131 S.Ct. at 1193.  The Supreme Court suggested that there could be no "cat's paw" liability where the independent investigation determines that, "apart from the supervisor's recommendation," the adverse action is entirely justified.  *Id.*  Here, the evidence in the record clearly demonstrates that President Miller determined, apart from, and prior to even reading Dr. Tracey and Dr. Zanella's recommendations, that the denial of tenure was entirely justified through his own review and assessment of the student evaluations and the quality of Rajaravivarma's publications.  As discussed above, President Miller determined that Rajaravivarma had deficiencies based on his initial independent assessment of the student evaluations and his publications prior to reviewing any recommendations from the other levels of the tenure process.  In his judgment, the tenure portfolio submitted by Rajaravivarma was "mediocre."  This is simply not the case, envisioned by the Supreme Court, where the independent investigation took the supervisor's allegedly biased report into account without determining that the adverse action was entirely justified apart from that supervisor's recommendation.  Accordingly, Dr. Zanella or Dr. Tracey's recommendations cannot be

considered a causal factor in President Miller's decision to deny tenure.

The Supreme Court further contemplated that there could be no "cat's paw" liability where the independent investigation does not rely on facts provided by the biased supervisor. *See Staub*, 131 S.Ct. at 1193 ("if the independent investigation relies on facts provided by the biased supervisor – as is necessary in any case of cat's-paw liability – then the employer (either directly or through the ultimate decision maker) will have effectively delegated the fact finding portion of the investigation to the biased supervisor.").   Here there is simply no evidence that President Miller relied on any facts provided by Dr. Tracey or Dr. Zanella and thereby delegated the fact finding portion of the investigation to either one of them.  To the contrary, President Miller relied on the tenure portfolio submitted by the Plaintiff and found it lacking.  He unequivocally testified that neither Dr. Tracey nor Dr. Zanella focused him on Rajaravivarma's deficiencies in load credit activity and instead he determined there were deficiencies from his own review of the student evaluations prior to even reading Dr. Tracey's or Dr. Zanella's recommendations.  A reasonable juror could therefore not conclude based on President Miller's testimony that he relied on facts provided by Dr. Tracey or Dr. Zanella as the Supreme Court has stated is "necessary in any case of cat's-paw liability." *Id.*

In addition, the facts of the present case are inapposite to the facts of *Staub*.  In *Staub*, the plaintiff was fired following the issuance of a disciplinary warning.  The plaintiff alleged that his biased supervisors had fabricated an allegation underlying the disciplinary warning they issued to him out of hostility toward his military obligations. *Id.* at 1189-90.  The plaintiff then challenged his firing through his company's internal grievance process claiming that his biased supervisors had fabricated the allegations.

The ultimate decision maker, although aware of the plaintiff's accusation of fabrication, did not follow up with the allegedly biased supervisors regarding the accusation and instead adhered to the decision to terminate the plaintiff. *Id.*  Here, there is no allegation that Dr. Zanella or Dr. Tracey's recommendations were based on false or fabricated information that President Miller failed to substantiate their claims or that he relied upon their recommendations in reaching his decision to deny tenure.

Plaintiff also contends that Dr. Zanella and Dr. Tracey's negative assessment of his academic credentials can only be result of their impermissible bias.  Plaintiff further suggests that President Miller could not have come to his own conclusion that his credentials were not sufficient without relying on Dr. Zanella or Dr. Tracey's recommendations.  Plaintiff emphasizes that the DEC and PTC recommended granting tenure and suggests that the only reason why there were any dissenting voices was because of impermissible bias.  However, the Dean also issued a negative recommendation which likewise concluded that Rajaravivarma had deficiencies in load credit and creative activity and  Rajaravivarma does not contend the Dean is biased.

Although Plaintiff summarily states in his memorandum in opposition to summary judgment that the Dean's recommendation was influenced by Dr. Zanella and Dr. Tracey's recommendation and suggests that the Dean's recommendation is therefore also tainted by impermissible bias, the Plaintiff presents no evidence whatsoever that the Dean's recommendation was influenced by or that he relied on Dr. Zanella or Dr. Tracey's recommendations.  It is further clear from the content of the Dean's recommendation that the Dean drew his own independent conclusions from his own review of Rajaravivarma's portfolio.  *See* [Dkt. #48, Ex. A, Attachment 14].  For example, the Dean points to two particular student evaluations that he feels is

emblematic of Plaintiff's deficiencies in load credit activity.

Furhter, the Plaintiff has not alleged that the Dean exhibited any bias himself against his national origin, religion, or race.  Accordingly, Plaintiff's suggestion that only a biased individual could conclude that Rajaravivarma's credentials were insufficient is undermined by the Dean's unbiased recommendation.

This argument is further undermined by the undisputed facts that both the DEC and the Dean had on-going concerns regarding Rajaravivarma's load credit and creative activity in the 2003, 2005 and 2006 annual evaluations of  Rajaravivarma for contract renewal.   In 2003, the DEC noted students in CET 501 expressed concerns about the course and that they wanted to see Rajaravivarma continue grant writing. [Dkt. #42, Ex. D, Attachment 1].  In 2005, the DEC indicated that many students had complained about the lack of laboratory or hand-ons work and hoped that Rajaravivarma will address these concerns.  [Dkt. #42, Ex. D, Attachment 2].  In 2005, Dean Kremins indicated that Rajaravivarma needed to improve certain aspects of his teaching, revise his course syllabuses and launch a long-term research agenda.  [*Id.*].  Lastly, in 2006 the DEC noted their concern that Rajaravivarma had not published any refereed journal articles since 1994 and reiterated that the student evaluations were still critical of his lack of hands-on knowledge.  [Dkt. #42, Ex. D, Attachment 3].  In 2006, Dean Kremins recommended renewal "with serious reservations" reiterating his major concerns regarding load credit and creative activity.  [Dkt. #42, Ex. B, Attachment 2].  A reasonable juror would not find it surprising that President Miller came to his own independent conclusion that Rajaravivarma was deficient in load credit and creative activity considering that these deficiencies had been consistently raised by other unbiased sources for several years prior to his application for tenure.  Considering the

consistent feedback Rajaravivarma received through the contract renewal process regarding his load credit and creative activity, a reasonable juror would also not find it surprising that President Miller determined for himself that Rajaravivarma's load credit and creative activity was lacking.

In sum, a reasonable juror could not conclude that Dr. Tracey or Dr. Zanella's negative recommendations were the proximate cause of President Miller's conclusion that Rajaravivarma's load credit and creative activity did not meet the quality standards to be granted tenure particularly in light of the fact that President Miller came to this conclusion on his own from his independent review of Rajaravivarma's portfolio and considering that other unbiased sources came to the same conclusions for the same reasons in years past.  There is simply no evidence that Dr. Tracey or Dr. Zanella were the proverbial monkeys inducing President Miller by their negative recommendations to deny tenure to Rajaravivarma.  Since Plaintiff has failed to establish "cat's paw liability," Plaintiff has likewise failed to demonstrate that the legitimate non-discriminatory reason proffered by Defendants for denying tenure was a pretext for unlawful discrimination.

B.  Analysis of Plaintiff's remaining arguments

In addition to advancing a "cat's paw" theory, Plaintiff also attempts to demonstrate pretext in several other ways.  The Court will now address Plaintiff's other pretext arguments.

First, Plaintiff at various points in his memorandum in opposition to summary judgment invites the Court to second guess the university's denial of tenure, arguing that Rajaravivarma met the standards for both load credit and creativity activity under the CBA and articulated by President Miller at the open faculty forum to be granted

tenure.  However as the Second Circuit has repeatedly emphasized courts "should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure."  *Liebermant*, 630 F.2d at 68 n.12 (internal quotation marks and citation omitted).  Since Plaintiff has not shown that President Miller's independent assessment of Rajaravivarma's portfolio and his own conclusion that  Rajaravivarma had deficiencies in load credit and creative activity has been "used as the mechanism to obscure discrimination" the Court will not endeavor to make its own determinations about such matters as  Rajaravivarma's "teaching ability, research scholarship, and professional stature" as "they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges."  *Bickerstaff*, 196 F.3d at 456 n.7 (internal quotation marks and citation omitted). It is axiomatic that a Plaintiff "must show more than a denial of tenure in the context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university."  *Zahorik*, 729 F.2d at 94 (internal quotation marks and citations omitted).  Here since Plaintiff has failed to establish "cat's paw" liability he has failed to show more than a denial of tenure in the context of a disagreement about the scholarly merits of his independent work.

Second, Plaintiff argues that two other professors, Professor Lefebvre and Professor Leonides, were granted tenure where they "appeared to also have difficulties in the areas specified as a problem for the Plaintiff by President Miller" and that a "reasonable jury could conclude therefore that the Plaintiff appeared as qualified for tenure as similarly situated candidates chose for tenure."  [Dkt. #47, Pl. Mem. p. 28]. However, the Second Circuit has warned that to "infer discrimination from a

comparison among [tenure] candidates is to risk a serious infringement of first amendment values.   A university's prerogative to determine for itself on academic grounds who may teach is an important part of our long tradition of academic freedom." *Lieberman*, 630 F.2d at 67.

In *Lieberman*, the Second Circuit concluded that the district court "did not err in declining plaintiff's invitation to engage in a tired-eye scrutiny of the files of successful male candidates  or tenure in an effort to second-guess the numerous scholars at the University of Connecticut who had scrutinized Dr. Lieberman's qualifications and found them wanting, in the absence of independent evidence of discriminatory intent or a claim that plaintiff's qualifications were clearly and demonstrably superior to those of the successful males, a claim which was not made by Dr. Lieberman because it could not have been substantiated." *Id.* 67-68.   Here since the Plaintiff has failed to establish "cat's paw" liability he has failed to demonstrate the existence of independent evidence of discriminatory intent.   As was the case in *Lieberman*, the Plaintiff has not made a claim that his qualifications were clearly and demonstrably superior to those of the other tenure candidates.   On the contrary, he argues his are no worse.  The Court therefore likewise declines Plaintiff's invitation to "engage in a tired-eye scrutiny" of Professor Lefebvre and Professor Leonides's files "in an effort to second guess" President Miller's tenure decisions.  *Id.*

Further, since Plaintiff was the only candidate for tenure from his department in 2007, any comparison to tenure candidates in other departments such as Professor Lefebvre and Professor Leonides would not be meaningful.  As the Second Circuit has explained, "[b]ecause of the decentralized nature of the decision-making process, comparisons which might tend to show unlawful discrimination are hard to come by.

A denial of tenure by an English department simply cannot be compared with a grant of tenure in the physics or history departments.  Even within a single department comparisons are difficult because the number of decisions within a particular period may be quite few, the decisions sometimes may be non-competitive and tenure files typically contain positive as well as negative evaluations, often in extravagant terms, sufficient to support either a grant or denial of tenure."  *Zahorik*, 729 F.2d at 93.

The Court also notes that Professor Lefebvre and Professor Leonides's full tenure portfolios have not been offered into evidence.  Therefore even if it were appropriate to accept Plaintiff's invitation, a meaningful comparison could be not accomplished without more evidence of their tenure applications and President Miller's decision making process regarding those applications.  Even if it was appropriate to do so the Court simply does not have enough evidence to compare tenure candidates.

Lastly, Plaintiff asserts in a footnote to his memorandum in opposition to summary judgment that there is "little in the way of comparator data available because Defendants failed to photocopy any of the portfolios belonging to the other fourteen faculty members evaluated for tenure by President Miller" and argues that a "reasonable jury could well conclude that since Defendants knew that the faculty union had requested a litigation hold on all 2006 tenure candidate's portfolios prior to the time Dr. Rathika Rajaravivarma's filed with CHRO in October, 2006, the Defendants should have known that the tenure portfolios for the 2007 candidates might be relevant if the Plaintiff pursued a complaint against the University." [Dkt. #47, Pl. Mem. p. 20-21 n.12].  Plaintiff further argues that "with such knowledge it would have been reasonable, a jury could conclude, for the University to photocopy all of that comparator data.  Instead it choose to only photocopy the Plaintiff's material.  Where

an issue such as that makes resolving motivation and intent important, summary judgment is clearly inappropriate."  [*Id.*].

Plaintiff's argument is unavailing as it finds no support in law.  Plaintiff is essentially accusing Defendants of spoliation and asking the Court to apply an adverse inference against Defendants in its summary judgment analysis.  The Court notes that Rajaravivarma's wife, in her own case before the District of Connecticut, accused Defendants of spoliation.  *See Nicholson v. Board of Trustees for the Connecticut State Univ. Sys.*, No.3:08cv1250, 2011 WL 4072685  (D. Conn. Sept. 12, 2011).  "Spoliation is the destruction or significant alteration of evidence or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  Once a party reasonably anticipates litigation, the party must suspend its routine document retention/destruction policy and place a litigation hold on the relevant documents to ensure their preservation."  *Id.* at 4 (internal quotation marks and citations omitted). The *Nicholson* court explained that "A party seeking a spoliation sanction has the burden to establish that (1) the party having control over the evidence had an obligation to preserve it at the time the evidence was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the claim or defense at issue."  *Id.* (citing *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001)).

Here, Plaintiff has failed to carry his burden to establish that a spoliation sanction is warranted.  Plaintiff has presented no facts that Defendants had an obligation to preserve the 2007 tenure portfolios at the time the evidence was not retained nor has Plaintiff provided any evidence that the evidence was destroyed, much less with a culpable state of mind.   Defendants explain that the CCSU does not

own the portfolios of the tenure candidates and had to return them to the tenure candidates pursuant to the terms of the CBA.  [Dkt. #55, Pl. Mem., p. 9].  Plaintiff speculatively argues that Defendants should have been aware that he would sue the university if he was denied tenure and suggests the university should have reasonably anticipated such litigation because Rajaravivarma's wife sued CCSU along with two other female tenure candidates the year prior.   However, the Court does not find that it was reasonably foreseeable that Rajaravivarma would sue Defendants for denial of tenure just because his wife and two other women had filed a gender discrimination suit against CCSU for denial of tenure.

   In *Nicholson*, the court found that a sanction for spoliation was warranted on the basis of an August 16, 2006 email sent by CCSU Chief Human Resources Officer requesting that CCSU retain all 2005-2006 promotion and tenure files pending a potential CHRO action."  *Id.* at *3, 5.  In the instant case, Plaintiff has not provided any much less equivalent evidence that CCSU was aware of his potential lawsuit and requested a litigation hold which was violated as was the case in *Nicholson*.  Moreover in light of tenure jurisprudence at the time tenure was denied, CCSU had every reason to believe that the tenure portfolios of candidates from other departments were not relevant.  *Zahorik*, 729 F.2d at 93 (noting the inability to compare tenure applications from different departments of a university).  Accordingly, Plaintiff has failed to satisfy his burden to demonstrate a sanction for spoliation is warranted and therefore the Court will not apply an adverse inference.  Plaintiff's suggestion that a reasonable juror could conclude that Defendant's legitimate-non-discriminatory reasons were a pretext for unlawful discrimination as a result of Defendant's failure to "photocopy" the other tenure portfolios is not only unavailing but inappropriate in light of the high burden a

plaintiff must met to warrant the Court's application of such a serious and severe sanction.   For the reasons stated above, the Court grants summary judgment as to Plaintiff's Title VII discrimination claim.

Analysis of Title VII Retaliation Claim

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a).   Retaliation claims are also analyzed under burden shifting framework established by *McDonnell Douglas*.   In order to establish a prima facie case, a Plaintiff must show that (1) he participated in a protected activity; (2) the defendant knew of the protected activity; (3) he suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action.   *McMenemy v. City of Rochester*, 241 F.3d 279, 283083 (2d Cir. 2001).   The Supreme Court has broadened the spectrum of conduct that can qualify as an adverse employment action for retaliation cases finding that an adverse employment action is any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-62, 66 (2006).   "If the plaintiff sustains this burden, the employer must then articulate a legitimate, non-retaliatory reason for the adverse employment action. Once the employer offers such a reason, the presumption of retaliation disappears and 'the employee must show that retaliation was a substantial reason for the adverse employment action.'" *Tori*, 2009 WL 2767006, at *2 (quoting *Jute v. Hamilton Sundstrang Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

Here, Plaintiff argues that he participated in a protected activity at the faculty senate meeting when he spoke out about CCSU's discriminatory denial of tenure to female candidates and also by virtue of his wife's protected activity pursuant to *Thompson v. North American Stainless, LP*, ---U.S. ----, 131 S.Ct. 863 (2011).  In *Thompson*, the Supreme Court held that the act of firing an employee in retaliation against the employee's fiancée could constitute unlawful retaliation because such action might "'have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at  869 (quoting *Burlington*, 126 S.Ct. 2405)). Accordingly, Plaintiff may maintain a third-party retaliation claim on the basis of his wife's protected activity.  In addition, the definition of protected activity does encompass "informal protests of discriminatory employment practices," such as "making complaints to management."  *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  However "[t]o succeed on retaliation claim, the plaintiff must show that the employer could reasonably have understood that the plaintiff's opposition was directed at conduct prohibited by Title VII."  *Chacko v. Connecticut*, No.3:07-cv-1120, 2010 WL 1330861, at *12 (D. Conn. March 30, 2010).   Here, Defendants could have reasonably understood that Plaintiff's speech at the faculty senate meeting was directed at conduct prohibited by Title VII.  Accordingly, Plaintiff has established the first requirement of his *prima facie* case of retaliation.

Defendants suggest that President Miller was not aware of Plaintiff's speech at the faculty senate meeting.  Although, Plaintiff does not directly allege facts that Miller knew, or at least remembered, that the Plaintiff had spoken out against the discriminatory treatment of his wife when he made his decision to deny Plaintiff tenure, Plaintiff has alleged that President Miller as the ex officio member of the Senate would

have attended the meetings where Plaintiff spoke.  In viewing the facts in the light most favorable to the Plaintiff, a reasonable juror could conclude that President Miller was aware of Plaintiff's speech at the faculty senate meeting.  Further, there is no dispute that President Miller was aware of Rajaravivarma's wife's protected activity.  The parties also do not dispute that Plaintiff suffered an adverse employment action when he was denied tenure.   Therefore, Plaintiff has met the second and third requirements of his *prima facie* case of retaliation.

Defendants argue that Plaintiff cannot demonstrate that a causal connection exists between the protected activity and the adverse action because there was not sufficient temporal proximity to demonstrate causation.  When temporal proximity alone is used to show causation, the proximity must be "very close" in order to support a *prima facie* case of retaliation*. Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (20 month period suggested, "by itself, no causality at all"); *see also Walder v. White Plaints Bd. of Educ.*, 738 F. Supp. 2d 483, 503 (S.D.N.Y. 2010) ("most of the decisions in this Circuit that have addressed this issue have held that lapses of time shorter than even three months are insufficient to support an inference of causation"); *Ghaly v. U.S. Dept. of Agric.*, 739 F. Supp. 2d 185, 200 (E.D.N.Y. 2010) (nine month period between protected conduct and retaliation did not support causation); *Ragin v. E. Ramapo Cent. School Dist.*, No. 05 Civ. 6496, 2010 WL 1326779 at *24 (S.D.N.Y. Mar. 31, 2010) (five month period did not support causation); *but see Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 230 (E.D.N.Y. 2010) (failure to promote retaliation claim occurring just over three months after protected conduct did demonstrate causation where that was the first opportunity for accused to take retaliatory action).  Plaintiff's wife filed her CHRO complaint against CCSU in October

2006 and alleges that around the fall or winter of 2006 he spoke at the faculty senate meetings.  Therefore there was potentially a three to six month period between the protected activities and President Miller's decision to deny tenure in mid-April 2007.  Plaintiff argues that the denial of tenure in mid-April 2006 was the first opportunity available to Defendants to retaliate and therefore a causal nexus between the protected conduct and that discriminatory retaliation can be established.  The Court will assume without deciding that the three to six month period at issue supports causation since Plaintiff has otherwise failed to demonstrate that Defendants' legitimate non-retaliatory reasons for denying tenure were a pretext for unlawful retaliation.

Plaintiff again relies on a "cat's paw" theory to establish his retaliation claim.  However, Plaintiff's reliance on this theory fails for a number of reasons.  First, Plaintiff argues that since Dr. Zanella and Dr. Tracey's negative tenure recommendations were motivated by racial, national origin and religious animus a reasonable trier of fact could also conclude that their recommendations were likewise motivated by retaliation for Plaintiff and his wife's protected activities.  However evidence that an individual is motivated by race, national origin and religious bias, without more, cannot establish that the individual was also motivated by retaliation for protected activity.   Moreover, the biased comments that Dr. Zanella and Dr. Tracey allegedly made all took place years before Plaintiff or his wife's protected activities.  It is therefore impossible to infer that such comments reflect a retaliatory animus.  Second, Plaintiff has not pointed to any evidence that his and his wife's protected activities factored into Dr. Zanella or Dr. Tracey's decision to submit negative tenure recommendations to President Miller.  Assuming that Plaintiff could establish that Dr. Zanella or Dr. Tracey's negative tenure recommendations were motivated by impermissible retaliation, for the same reasons

as discussed above the Plaintiff has failed to establish that cat's paw liability is appropriate considering the undisputed facts regarding President Miller's independent investigation and decisionmaking process.

Plaintiff has also not pointed to any evidence that his or his wife's protected activities factored into President Miller's own decision to deny tenure. Instead, Plaintiff argues that a pretext for retaliation is demonstrated by the "material fact with regard to Plaintiff's actual record" in teaching and creative activity and "whether his teaching activity and his scholarship was comparable to candidates who were granted tenure." [Dkt. #47, Pl. Mem., 31]. Once again, Plaintiff is inviting the Court to engage in inappropriate substitution of its own judgment based upon its nascent knowledge of CCSU tenure criteria, and to assess the qualifications of faculty members for promotion and tenure. As discussed above, a plaintiff must show more than a denial of tenure based upon a disagreement "about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university" *Zahorik*, 729 F.2d at 94 (internal quotation marks and citations omitted). In addition, as discussed above any comparison to other tenure candidates in other departments are unlikely to demonstrate unlawful discrimination or retaliation. As the Second Circuit has emphasized "when a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of their qualifications, no inference of discrimination [or retaliation] can be drawn." *Lieberman*, 630 F.2d 60 at 67 (internal quotation marks and citation omitted, alteration in original). Considering the First Amendment interest of a university to determine for itself on academic grounds who may teach, particularly were as occurred here, that decision is made independently by

a person not alleged to have acted discriminatorily, the Court once again declines Plaintiff's invitation to engage in a tired-eye scrutiny of the files of successful tenure candidates in an effort to second guess President Miller's assessment of Plaintiff's academic credentials.  Accordingly, Plaintiff has failed to demonstrate that Defendants' legitimate non-retaliatory reasons for denying tenure were a pretext for retaliation.  For the reasons stated above, the Court grants summary on Plaintiff's Title VII retaliation claim.

### Analysis of Section 1981 Discrimination Claim

Defendants argue that Plaintiff's Section 1981 claims against the State and the Board are barred by the Eleventh Amendment.  Defendants also argue that since Plaintiff has not brought his Section 1981 claim pursuant to section 1983 summary judgment should be granted.  Plaintiff indicates his opposition to summary judgment that his complaint states that the Section 1981 claims are brought pursuant to 42 U.S.C. Section 1983 and that his complaint makes clear that the Section 1981 claims were brought against President Miller in his individual capacity only.   Accordingly, the Court will construe Plaintiff's complaint as alleging Section 1981 claims against President Miller in his individual capacity only and brought pursuant to Section 1983.

Defendants argue that Plaintiff cannot maintain a Section 1981 discrimination claim on the basis of national origin since Section 1981 only prohibits discrimination on the basis of race and not national origin.  Plaintiff essentially concedes that his 1981 claim is based not on Plaintiff's national origin but upon Plaintiff's membership in the Indian or Tamil race and reminds the court that "race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case."  *Deravin*, 335 F.3d 195, 201-202 (2d Cir.

2003).   Accordingly, the Court will assess Plaintiff's Section 1981 claim on the basis of his claim for discrimination based on race.

The Second Circuit has held that Section 1981 claims brought pursuant to Section 1983 are analyzed under the same standard as Title VII claims.  *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) ("Both Mr. Ruiz's Title VII Claims and his claims for race and national origin discrimination under Sections 1981 and 1983 are analyzed under the burden-shifting framework set forth in *McDonnell Douglas . . .*"); *see also Vargas v. Morgan Stanley*, 438 Fed. Appx. 7, 9 n. 1 (2d Cir. 2011) (citing *Ruiz*); *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("[T]he factors justifying summary judgment dismissing Patterson's Title VII claim against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983").

The Court notes that a recent Second Circuit decision remanded the question of whether "cat's paw liability" as articulated by the Supreme Court *Staub* should apply to a Section 1983 employment discrimination claim.  *See Nagle v. Marron*, 663 F.3d 100, 118 (2d Cir. 2011).  The Court applies, without holding, that the cat's paw theory of liability is applicable under Section 1981 discrimination claims brought pursuant to Section 1983.  Accordingly, the Court grants summary judgment on Plaintiff's Section 1981 / Section1983 claims for the same reasons as the Title VII claims, stated *supra*.

## Analysis of Right to Intimate Association Claim

Defendants again argue that Plaintiff's claim for violation of the right to intimate association against the State and the Board are barred by the Eleventh Amendment. As Plaintiff indicated before, his section 1981 and 1983 claims are brought solely against President Miller in his individual capacity.  Defendants also argue that

Plaintiff's claim for violation of the constitutional right of intimate association cannot be brought pursuant to Section 1981 which "is limited to providing a cause of action based on race in contractual or employment relations or retaliation in response to plaintiff's assertion of rights protected by §1981." [Dkt. #55, Def. Mem., 9-10]. However, Plaintiff's omnibus complaint can be construed to allege this cause of action under Section 1983 as well and therefore the Court will consider Plaintiff's arguments in this regard.

President Miller argues that since Plaintiff has asserted a claim for violation of his right to intimate association arising under the First Amendment, the standard applicable to Plaintiff's claim is the standard used by the Second Circuit for claims of employment retaliation in violation of the First Amendment. *See* [Dkt. #41, Def. Mem., 37]. On the other hand, Plaintiff contends that his claim is not a typical First Amendment retaliation claim but rather a claim for breach of the constitutional right of intimate association which the Second Circuit addressed in its decision in *Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999). Plaintiff argues that his right of intimate association was violated because he was denied tenure in retaliation for wife's conduct.

The Second Circuit in *Adler* explained that "[t]he Supreme Court has recognized a right of association with two distinct components-an individual's right to associate with others in intimate relationships and a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment, such as speech and other expressive conduct." *Id.* at 42 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984)). The Second Circuit further noted that "the source of the intimate association right has not been authoritatively determined. Language in *Roberts* suggests that this right is a component of the personal liberty

69

protected by the Due Process Clause." *Id.* (citations omitted).  Plaintiff appears to assert this right under both the First and Fourteenth Amendments since the source of this right has not been authoritatively determined.

However notwithstanding the Second Circuit's acknowledgment of such uncertainty, in *Adler* the Second Circuit held that where "a spouse's claim that adverse action was taken solely against that spouse in retaliation for conduct of the other spouse should be analyzed as a claimed violation of a First Amendment right of intimate association." 185 F.3d at 44; *see also Agostino v. Simpson*, No.08-cv-5760(CS), 2008 WL 4906140, at *9 (S.D.N.Y. Nov. 17, 2008) ("Where a plaintiff is allegedly retaliated against for the First Amendment activities of a family member and asserts a claim based on intimate association, the courts in this Circuit have considered the claim as deriving from the First Amendment.").  In *Adler*, as is the case here, the plaintiff alleged that he was discharged from his employment in retaliation for his wife's employment discrimination lawsuit against the state.

Plaintiff argues that a reasonable trier of fact could conclude President Miller's decision to deny tenure was in retaliation for his wife's lawsuit and restates the same arguments he made in connection with his Title VII retaliation claim in support of his claim for violation of the right to intimate association.  [Dkt. #47, Pl. Mem. 37-38].  As discussed above, Plaintiff has failed to offer any evidence that his wife's lawsuit was a factor in the decision to deny tenure beyond the fact that President Miller was aware of the lawsuit.  Whereas in *Adler*, the Second Circuit concluded that Adler had presented substantial evidence that his wife's lawsuit was the basis for his discharge since "[o]ne of his supervisors in the week before discharge, reportedly mentioned his wife's litigation and the embarrassment it was causing state officials."  *Adler*, 185 F.3d at 45.

70

As discussed above, the Court also declines Plaintiff's invitation to infer retaliation from the "context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university." *Zahorik*, 729 F.2d at 94 (internal quotation marks and citations omitted).  The Court also declines to infer retaliation through a tired-eye scrutiny of the files of successful tenure candidates.  Accordingly, a reasonable trier of fact would not conclude that the decision to deny tenure was in retaliation for Plaintiff's wife's lawsuit and thereby a violation of Plaintiff's right to intimate association.

Assuming that Plaintiff was able to establish that President Miller's decision to deny tenure was retaliatory, Plaintiff has likely failed to create a genuine issue of material fact as to whether his right to intimate association was actually violated.  In *Adler*, the Second Circuit acknowledged that [j]ust as the source of a right of intimate association has varied, so has the standard applied in determining whether that right has been violated.  Sometimes court opinions suggest that an intimate association right is not violated unless the challenged action has the likely effect of ending the protected relationship … In other cases, the opinions consider whether the challenged action alleged to burden an intimate association is arbitrary or an " 'undue intrusion' by the state into the marriage relationship."  *Adler*, 185 F.3d at 43-44 (citations omitted).

Here under either standard, Plaintiff has likely failed to demonstrate that his right to intimate association was violated.  First, Plaintiff has failed to present any evidence that the denial of tenure had the likely effect of ending his marriage.  Second, Plaintiff has failed to demonstrate that the denial of tenure created an arbitrary or undue intrusion into his marriage.  Plaintiff alleges that because his denial of tenure he was

forced to take a job in a distant city and that because he and his wife are unable to return home until late at night they decided to place their fourteen year old daughter in an exclusive female preparatory boarding school.  Choosing to send their daughter to a private boarding school is simply not an arbitrary or undue intrusion into Plaintiff's marriage.  First, Plaintiff does not allege any facts on how placing his daughter in boarding school affected his marriage with his wife.   To the extent his claim is based on the intrusion into the relationship with his daughter, such intrusion is likely insufficient to establish a violation of the right to intimate association.  *See Garten v. Hochman*, No.08CIV.9425(PGG), 2010 WL 2465479, at *5 (S.D.N.Y.  June 16, 2010) (in assessing whether there was undue intrusion in a right to intimate association claim considered that "in connection with child custody, the Second Circuit has held that the substantive due process right to familial association is not infringed unless the separation of parent and child is 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" (quoting *Anthony v. City of New York*, 339 F.3d 129, 142-43 (2d Cir. 2003)).

Lastly, President Miller argues in the alternative that he is entitled to the protection of the affirmative defense of dual motivation.  In *Adler*, the Second Circuit acknowledged that "if Adler could prove that his discharge was motivated entirely, as he contends, or even in part as a retaliation for his wife's lawsuit, the State is entitled to present the affirmative defense of dual motivation and seek to persuade the trier of fact that it would have discharged Adler solely for a permissible motive. The dual motivation defense requires the trier to consider, not what the motivation was, but whether the employer would have taken the same adverse action because of an available permissible motive." Adler, 185 F.3d at 46 (citing *Mt. Healthy City School*

*District Board of Education v. Doyle*, 429 U.S. 274 (1977)).  Assuming that Plaintiff had presented sufficient evidence which would permit a reasonable trier of fact to conclude that he was denied tenure entirely or even in part in retaliation, President Miller has presented sufficient evidence that would persuade the trier of fact that he also denied tenure for the permissible motive that Plaintiff had deficiencies in load credit and creative activity particularly in light of the fact that the Dean and the DEC had raised their serious concerns regarding Plaintiff's load credit and creative activity in 2003 and 2005 prior to his or his wife's protected activities.  Accordingly, President Miller would be entitled to the protection of such an affirmative defense.

For the reasons stated above, the Court grants summary judgment on Plaintiff's Section 1981 and 1983 claims against President Miller.  Since Plaintiff has failed to establish his Section 1981 and 1983 claims against President Miller, the Court need not address whether President Miller is entitled to qualified immunity.

<u>Conclusion</u>

The Defendants' motion for summary judgment [Dkt. #42] is GRANTED as to all of Plaintiff's claims for the reasons stated above.  The Clerk is directed enter judgment in favor of Defendants and close the file.


IT IS SO ORDERED.


_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut, March 26, 2012